86 F.3d 227
 152 L.R.R.M. (BNA) 2558, 318 U.S.App.D.C. 153
 SERRAMONTE OLDSMOBILE, INC., d/b/a Serramonte Oldsmobile,
Serramonte Pontiac, Serramonte GMC Trucks and
Transcar Leasing, Inc., d/b/a Serramonte
Service Plaza, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Association of Machinists and Aerospace
Workers, District Lodge 190, Local Lodge No. 1414,
Intervenor.
 No. 95-1455.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 6, 1996.
Decided June 18, 1996.
 
 On Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
 Robert G. Hulteng, San Francisco, CA, argued the cause for petitioners, with whom Robert Leinwand, San Francisco, CA, was on the briefs.
 Robert J. Englehart, National Labor Relations Board, Washington, DC, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel and Margaret G. Neigus, Supervisory Attorney, Washington, DC, were on the brief.
 David A. Rosenfeld, Piedmont, CA, argued the cause and filed the brief, for intervenor.
 Before: EDWARDS, Chief Judge, SILBERMAN and ROGERS, Circuit Judges.
 Opinion for the Court filed by Chief Judge EDWARDS.
 HARRY T. EDWARDS, Chief Judge:
 
 
 1
 In the fall of 1992, after negotiating for several months with the International Association of Machinists and Aerospace Workers District Lodge 190, Local Lodge No. 1414 ("Union"), petitioners Serramonte Oldsmobile ("Oldsmobile") and Serramonte Service Plaza ("Service Plaza"), two commonly owned automotive facilities, each claimed that an impasse had been reached in collective bargaining with the Union. Accordingly, on September 2, 1992, Oldsmobile discontinued bargaining with the Union and unilaterally implemented most of its proposed contract terms; Service Plaza proceeded likewise on October 12, 1992. Several months later, petitioners entirely withdrew recognition from the Union and unilaterally implemented further changes to employee benefit plans and wage structures.
 
 
 2
 The Union filed unfair labor practice charges with the National Labor Relations Board ("Board"). The Board found that Oldsmobile was justified in taking unilateral action on September 2, 1992, because the Union, at that point in its dealings with Oldsmobile, had "engaged in a strategy of continually avoiding or delaying bargaining." Serramonte Oldsmobile, Inc., 318 N.L.R.B. No. 6 at 22 (1995), reprinted in Deferred Joint Appendix ("J.A.") 74. However, the Board did not view Service Plaza's actions in the same light. Although the Administrative Law Judge ("ALJ") found that the Union and Service Plaza had reached an impasse on September 14, 1992, he nevertheless determined that subsequent statements from the Union's bargaining representative indicated a willingness to negotiate further. Thus, the Board found that Service Plaza violated the National Labor Relations Act ("NLRA") by unilaterally implementing its proposed contract terms in October 1992. The Board found no lawful bases for the employers' withdrawals of recognition from the Union; these actions, along with petitioners' subsequent unilateral actions, were therefore held to constitute unfair labor practices. Petitioners now seek review of all the Board's unfair labor practice rulings.
 
 
 3
 We grant the petition only with respect to Service Plaza's unilateral implementation of its contract provisions in October 1992. On this issue, we hold that the evidence is insufficient to support a finding that the impasse reached on September 14th had been broken prior to Service Plaza's unilateral decision to implement changes. As to the other claims presented in this petition, we find the Board's determinations to be supported by substantial evidence and fully in accord with established law. Therefore, the petition for review and the Board's cross-application for enforcement are each granted in part and denied in part.
 
 I. BACKGROUND
 A. Overview
 
 4
 The facts of this case are recounted in great detail by the ALJ in his initial decision (which was adopted by the Board in toto). We therefore need only highlight those aspects of the record that are relevant to this opinion.
 
 
 5
 During most of the period in question, Service Plaza and Oldsmobile operated as separately incorporated facilities located within a mile of each other in Colma, California. Oldsmobile was a self-contained automobile dealership, encompassing retail sales, office, and service areas. Service Plaza was a complex of two buildings housing four separate vehicle servicing areas, each having its own car service pods, equipment, offices, and work areas. As of September 1991, one of the Service Plaza vehicle service areas was utilized for maintenance on Chrysler-Plymouth automobiles, one for Nissan-Isuzu, one for Lincoln-Mercury, and one was vacant. Both corporations were owned by Tom Price, who also held an ownership interest in a separately incorporated, non-union, Mitsubishi dealership. The Mitsubishi dealership was located in the general vicinity of the two unionized operations.
 
 
 6
 The Oldsmobile service technicians had been represented by the Union since at least 1977, and the most recent collective bargaining agreement was effective from July 16, 1989 until July 15, 1992. However, the Union did not gain certification at Service Plaza until August 9, 1991. The Service Plaza certification included "[a]ll full-time and regular part-time service technicians, including Chrysler-Plymouth/Lincoln-Mercury service technicians, Nissan-Isuzu service technicians [and other technicians] employed by the Employer at its Serramonte Service Plaza location in Colma, California." Decision and Direction of Election 1, 1 (1991), reprinted in Supplemental Appendix ("S.A.") 1. The certification also included a stipulation that specifically excluded from the unit the service technicians employed at the Mitsubishi dealership. Id. at 4, reprinted in S.A. 4.
 
 
 7
 During the months preceding the fall of 1992, both Oldsmobile and Service Plaza were in negotiations with the Union over the terms of proposed collective bargaining contracts. Compensation and fringe benefits appear to have been the principal points of contention. While the Union's proposed contracts included hourly wage rates and coverage under specified union-sponsored health and pension plans, the companies offered flat-rate compensation based on work production rather than hours worked, and a "cafeteria benefits plan" that included optional health insurance and retirement savings plans.
 
 
 8
 On September 2, 1992 and October 12, 1992, respectively, both Oldsmobile and Service Plaza declared that the negotiations were at an impasse and accused the Union of engaging in dilatory tactics designed to extend negotiations and prevent implementation of the employers' proposals. Both companies unilaterally adopted most of their contract proposals, but held off on making changes to the employee benefit plans.
 
 
 9
 In November 1992, owner Tom Price moved the technicians working at his Mitsubishi facility into the Service Plaza complex and transferred the Lincoln-Mercury technicians to the job site a quarter of a mile away where the Mitsubishi technicians had worked. Service Plaza informed the Union by letter that, as a result of the swap in work locations, the company took the position that the Mitsubishi technicians had become part of the Service Plaza bargaining unit and that the Lincoln-Mercury technicians, while still represented by the Union, were no longer part of the unit.
 
 
 10
 The Union had not responded to this letter when, on December 23, 1992, Service Plaza announced that it was withdrawing recognition from the Union because the company had received a petition, signed by a majority of employees in the reconstituted bargaining unit, expressing the desire not to be represented by the Union. This petition was signed by 19 technicians (9 Nissan, 6 Mitsubishi, 4 Chrysler-Plymouth) at a time when there were 11 Nissan, 6 Lincoln-Mercury, 12 Chrysler-Plymouth, and 10 Mitsubishi technicians. See Serramonte Oldsmobile, 318 N.L.R.B. No. 6 at 8 n. 18, reprinted in J.A. 60. Thus, the petition contained a "majority" of unit employees' signatures only if the bargaining unit were altered both to include the Mitsubishi technicians and to exclude the Lincoln-Mercury technicians.
 
 
 11
 During the course of 1993, Oldsmobile was dissolved as a separate corporate entity and merged into Service Plaza, and the Oldsmobile technicians were relocated to the Service Plaza complex. According to the employer, the Oldsmobile technicians became part of the now-unrepresented Service Plaza unit as a result of the move. Subsequently, Service Plaza unilaterally implemented its employee benefit plans for both Service Plaza and Oldsmobile employees, and made several other unilateral changes both to the wages paid under the new compensation system and to the previously imposed benefit packages.
 
 B. The Board's Decision
 
 12
 The ALJ found that petitioners had committed unfair labor practices by unilaterally implementing certain changes to terms and conditions of employment without first bargaining to impasse with the Union. With respect to the negotiations between Service Plaza and the Union, the ALJ determined that an impasse was indeed reached at the conclusion of an informal, off-the-record bargaining session held between the parties on September 14, 1992. However, according to the ALJ, the impasse was broken during a formal bargaining session that followed, because, at that session, the Union's representative made statements indicating a possible softening of the Union's bargaining position. Although Service Plaza had argued that the Union's statements were mere "legal posturing," the ALJ noted that the company did little during the month following the September 14th meeting to test the Union's sincerity. Id. at 18-19, reprinted in J.A. 70-71. Thus, having found that no impasse existed on October 12th, when Service Plaza proceeded to implement its contract terms, the ALJ found a violation of section 8(a)(1) and (5) of the NLRA.
 
 
 13
 As to the Oldsmobile negotiations, the ALJ found that, on September 2, 1992, the company's unilateral implementation of most of the provisions of its contract proposal was justified, because the Union had "engaged in a strategy of continually avoiding or delaying bargaining." Id. at 22, reprinted in J.A. 74. Nevertheless, the ALJ found that Oldsmobile was without justification in unilaterally implementing the employee benefits package several months later, because there was insufficient evidence that the Union had refused to bargain over these subsequent changes.
 
 
 14
 Finally, the ALJ ruled that Service Plaza's withdrawal of recognition from the Union was unlawful and that the employer could not avoid its collective bargaining obligations to the Oldsmobile employees merely by moving those workers into the Service Plaza complex. Having found that petitioners did not bargain to impasse with the Union concerning the various unilateral changes made in 1993, the ALJ determined that all of these changes were unlawful.
 
 
 15
 On July 31, 1995, the Board entered an order affirming the ALJ's decision and ordering petitioners to cease and desist the unfair labor practices, reinstate the terms and conditions that applied prior to the unilateral changes, make the employees whole for any losses sustained as a result of the changes, and bargain with the Union upon request.
 
 II. ANALYSIS
 
 16
 A. Impasse in Negotiations Between Service Plaza and the Union
 
 
 17
 Sections 8(a)(5) and 8(d) of the NLRA require parties in a collective bargaining relationship to negotiate in good faith over mandatory subjects of bargaining, including "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d) (1994); see NLRB v. Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722-23, 2 L.Ed.2d 823 (1958). Thus, neither side may take unilateral action with respect to mandatory subjects of bargaining without first satisfying the duty to bargain. See Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991). However, because the NLRA compels only good-faith bargaining, not agreement, the parties may reach an impasse in negotiations. At that point, the duty to bargain has been temporarily satisfied, and "an employer does not violate the [NLRA] by making unilateral changes that are reasonably comprehended within his pre-impasse proposals." American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622, 624 (D.C.Cir.1968).
 
 
 18
 Although a good-faith impasse in negotiations temporarily suspends the duty to bargain, the parties are not permanently relieved of bargaining obligations. See Charles D. Bonanno Linen Serv., Inc. v. NLRB, 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982) ("As a recurring feature in the bargaining process, impasse is only a temporary deadlock or hiatus in negotiations which in almost all cases is eventually broken, through either a change of mind or the application of economic force." (internal quotation omitted)). Thus, "[w]hen ... a deadlock is reached between the parties, the duty to bargain about the subject matter of the impasse merely becomes dormant until changed circumstances indicate that an agreement may be possible." Hi-Way Billboards, Inc., 206 N.L.R.B. 22, 23 (1973) (emphasis added); see also Civic Motor Inns, 300 N.L.R.B. 774, 775 (1990) (The Board required that there be an "intervening event ... that would be likely to affect the existing impasse or the climate of bargaining.").
 
 
 19
 In this case, the ALJ explicitly found that the parties reached "a genuine impasse in bargaining" at the conclusion of the informal, off-the-record negotiating session held between representatives of Service Plaza and the Union on September 14, 1992. Serramonte Oldsmobile, 318 N.L.R.B. No. 6 at 19, reprinted in J.A. 71. Indeed, the record reveals that the two bargaining representatives "looked at each other and said, look, we gave it our best shot. Shook hands. And that was it." Tr. of Hearing at 1209; see also Serramonte Oldsmobile, 318 N.L.R.B. No. 6 at 18, reprinted in J.A. 70. Thus, the only relevant question is whether, after that point, the circumstances surrounding the negotiations changed sufficiently to break the impasse.
 
 
 20
 Although we generally defer to the Board's expertise in evaluating the nuances of the bargaining process, see Teamsters Local Union No. 639 v. NLRB, 924 F.2d 1078, 1083 (D.C.Cir.1991), the Board must nevertheless point to "substantial evidence" in the record to support its conclusion that the impasse was broken, 29 U.S.C. § 160(e) (1994). Here, the ALJ offered descriptions of the Union's various negotiating postures that fell far short of indicating an intention to break the parties' impasse. For example, the ALJ noted that the statements of Union lawyer David Rosenfeld at the formal negotiating session on September 14 "ostensibly represented serious movement by the Union," and that the Union "was signaling its apparent willingness to accept [the employer's wage proposal]," and that the Union's actions "seemingly negated the existence of impasse between the parties." Serramonte Oldsmobile, 318 N.L.R.B. No. 6 at 19, reprinted in J.A. 71 (emphasis added). These findings offer about as much as a handful of air. Indeed, the ALJ recognized that the Union's position "was hardly free from ambiguity," but thought that the Union lawyer's statements "should have caused [Service Plaza] to contemplate whether the Union was reconsidering." Id. at 18, reprinted in J.A. 70. The record does not support the ALJ's findings, and his assumptions about the duty to bargain are simply wrong.
 
 
 21
 The Board itself has indicated that a party's "bare assertions of flexibility on open issues and its generalized promises of new proposals [do not clearly establish] any change, much less a substantial change" in that party's negotiating position. Civic Motor Inns, 300 N.L.R.B. at 776 (internal quotations omitted). Rather, there must be substantial evidence in the record that establishes changed circumstances sufficient to suggest that future bargaining would be fruitful. In this case, not a single one of the Union's statements cited by the ALJ actually committed the Union to a new position or contained any specific proposals. Instead, the record reflects that the Union's attorney offered only vague generalities and neither explicitly agreed to any of the employer's proposals nor offered any specific counterproposals.
 
 
 22
 Moreover, the ALJ appears to have placed the burden on Service Plaza to "contemplate whether the Union was reconsidering." Serramonte Oldsmobile, 318 N.L.R.B. No. 6 at 18, reprinted in J.A. 70. This statement reflects a clear misunderstanding of the relevant inquiry. Indeed, the ALJ goes so far as to fault Service Plaza, because, "rather than probing [the Union's] frankness," the company "merely repeated ... demands for counterproposals." Id. at 19, reprinted in J.A. 71. We are at a loss to understand exactly how a negotiating party, having reached the end of the line with its own proposals, can probe the "frankness" of the opposition except by requesting concrete proposals from the other side. In other words, there is absolutely no basis for requiring a negotiating party to probe the sincerity of another party's contentless statements after an impasse has already been reached. Rather, it is incumbent on the party asserting that the impasse has been broken to point to the changed circumstances that would justify such a finding. See Civic Motor Inns, 300 N.L.R.B. at 776 (The Board found that an impasse had not been broken because the party seeking to negotiate "failed to give a sufficient indication of changed circumstances to suggest that future bargaining might be fruitful."). Because the record evidence indicates that any purported changes to the Union's negotiating position could not have been recognized by any reasonable bargaining agent on the other side of the table, there can be no doubt that Service Plaza acted lawfully in implementing its proposed terms on October 12, 1992.B. Withdrawal of Recognition
 
 
 23
 Although an incumbent union enjoys a rebuttable presumption that it retains the support of a majority of the employees in the bargaining unit, Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 38, 107 S.Ct. 2225, 2233, 96 L.Ed.2d 22 (1987), Service Plaza nevertheless asserts that its withdrawal of recognition from the Union on December 23, 1992 was lawful. According to the company, it was free to withdraw recognition after receiving an employee petition indicating that the Union no longer enjoyed majority support.
 
 
 24
 However, it is undisputed that this petition, which was signed by 19 employees, only constituted a majority of bargaining unit employees if that unit were defined to include the Mitsubishi employees and exclude the Lincoln-Mercury technicians. Yet, the original unit certification specifically included "Chrysler-Plymouth/Lincoln-Mercury service technicians" and did not list Mitsubishi technicians as within the scope of the bargaining unit. Decision and Direction of Election at 1, reprinted in S.A. 1. In fact, the certification contains a stipulation specifically excluding the Mitsubishi employees from the unit. Id. at 4, reprinted in S.A. 4.
 
 
 25
 Service Plaza contends that, because the unit certification refers to technicians "employed by the Employer at its Serramonte Service Plaza location," id. at 1, reprinted in S.A. 1 (emphasis added), the employer's decision to switch the job locations of the two sets of employees in November 1992 necessarily altered the bargaining unit. However, neither the certification, nor the stipulation, indicates that the bargaining unit is based solely on the work location of the technicians or that the scope of the unit would automatically change with the relocation of the technicians.
 
 
 26
 Indeed, Service Plaza appears to have recognized that it was actually seeking to reconfigure the bargaining unit, because the company sent a letter informing the Union of the proposed changes and requesting that the Union respond. Letter from Robert G. Hulteng to David A. Rosenfeld (Nov. 17, 1992), reprinted in Deferred Joint Exhibits ("J.E.") 24-25. Moreover, in its brief, Service Plaza goes so far as to assert that, because the Union did not reply to this letter, the Union should be deemed to have acquiesced to the alteration. Amended Final Brief of Petitioners at 45 n.28. This contention is absurd. The scope of the bargaining unit is a permissive, not a mandatory, subject of bargaining, Branch Int'l Servs., Inc., 310 N.L.R.B. 1092, 1103, enforced, 12 F.3d 213 (6th Cir.1993), and the Union was therefore under no obligation to respond to the company's letter, see Borg-Warner Corp., 356 U.S. at 349, 78 S.Ct. at 722 (The Court ruled that, as to permissive subjects of bargaining, "each party is free to bargain or not to bargain, and to agree or not to agree."). As this court has recognized, "neither an employer nor a union has the unilateral power to modify the scope of the bargaining unit as determined by the Board, whether following bargaining to impasse or otherwise." Boise Cascade Corp. v. NLRB, 860 F.2d 471, 475 (D.C.Cir.1988). Thus, the Union's silence on the issue cannot be construed as acquiescence, and Service Plaza was required to get an agreement from the Union on any change in the scope of the unit, see 1 PATRICK HARDIN, THE DEVELOPING LABOR LAW 931 (3d ed. 1992) ("Even when the Board has defined a unit, the parties are free to agree on a negotiated unit different from the certified or recognized unit."), or to seek unit clarification from the Board, see 29 C.F.R. § 102.60(b) (1995). The employer could not change the unit on its own motion, and it could not compel the Union to bargain over the matter.
 
 
 27
 Nor can Service Plaza assert that it had a "good-faith doubt" about whether the Union continued to command majority support. Even accepting, arguendo, that a good-faith doubt regarding the proper scope of the unit would be sufficient to rebut the presumption of majority support for the Union, in this case the Board effectively ruled that no such good-faith doubt would be possible. The ALJ noted that the certification clearly delineated the scope of the unit and that the parties had stipulated to the exclusion of the Mitsubishi employees. Serramonte Oldsmobile, 318 N.L.R.B. No. 6 at 20 n. 59, reprinted in J.A. 72. Given the fact that the Union never agreed to change the scope of the unit, the Board rightly concluded that the employer could not rely on an insignificant change of work location to withdraw recognition. Accordingly, the various unilateral changes imposed by Service Plaza after the withdrawal of recognition were unlawful.
 
 
 28
 C. Unilateral Implementation of New Benefit Plans for Oldsmobile Employees
 
 
 29
 Although a negotiating party generally may not unilaterally impose contract terms without first bargaining to impasse, the Board has recognized an exception when, in response to one party's "diligent and earnest efforts to engage in bargaining," the other party "insists on continually avoiding or delaying bargaining." M & M Bldg. & Elec. Contractors, Inc., 262 N.L.R.B. 1472, 1472 (1982); accord International Ass'n of Fire Fighters, 304 N.L.R.B. 401, 402 (1991); Master Window Cleaning, Inc., 302 N.L.R.B. 373, 374 (1991), enforced, 15 F.3d 1087 (9th Cir.1994). Applying this exception, the Board found that Oldsmobile acted lawfully when the company implemented most of the terms of its final contract proposal on September 2, 1992.
 
 
 30
 At the time it implemented these terms, however, Oldsmobile did not implement a final proposal on employee health insurance and retirement plans. Instead, on November 13, 1992, Oldsmobile submitted revised benefit plans to the Union, and stated that, if the Union so desired, Oldsmobile would be willing to bargain over the proposed changes. See Letter from Robert G. Hulteng to David G. Rosenfeld (Nov. 13, 1992), reprinted in J.E. 22-23. The parties held bargaining sessions on the benefit plans, on December 16 and again on December 30, 1992. At the second meeting, the Union submitted two counterproposals, which the employer rejected. A third session was scheduled for February 5, 1993, but it was canceled due to the illness of one of the Union negotiators. Without further bargaining, the employer then unilaterally implemented its benefit plans in February and March, 1993. Thus, the relevant question is whether, with regard to the negotiations over benefit plans, the Union acted in the same dilatory manner it had previously, thereby justifying another waiver of the impasse requirement.
 
 
 31
 Petitioners argue that the Union acted no differently than it had earlier in attempting to delay negotiations over the benefit plans and stall any possible finding of impasse. To support this view, petitioners note that it took over a month to get the Union to come to the bargaining table in December 1992, that the Union appeared at the December 16th meeting without any proposals or counterproposals despite the fact that the Union had known for months what Oldsmobile was proposing, that the Union's various information requests at the meetings were merely stall tactics, that the counterproposals offered by the Union at the December 30th meeting were not made in good faith because it was transparently clear that the proposals would be unacceptable to Oldsmobile, and that the Union then invented reasons not to meet beyond the December sessions.
 
 
 32
 Given the history of delaying tactics by the Union, petitioners' argument has some force. Nevertheless, we will defer to the Board's interpretation of the scope of the bargaining obligation under section 8(d) of the NLRA if it is "reasonably defensible." Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). Here, the Board reasonably determined that the record evidence did not clearly show the Union's refusal to bargain in this instance. Rather, as the ALJ explicitly found, the evidence did not establish which party was responsible for the lapse in bargaining after December 30, 1992. See Serramonte Oldsmobile, 318 N.L.R.B. No. 6 at 23, reprinted in J.A. 75. Furthermore, while it is possible that the cancellation of the February meeting was due to bad faith, rather than illness, there is certainly no evidence in the record that would require the Board to reach such a conclusion. Finally, although the employer may have acted within its rights to reject the Union's counterproposals, the Board was free to treat these proposals as the by-product of legitimate, good-faith bargaining. Thus, while the question of whether the Union was engaging in dilatory tactics is not free of doubt, we find that there is sufficient evidence in the record to support the Board's findings.
 
 
 33
 D. The Appropriate Bargaining Unit for the Oldsmobile Employees
 
 
 34
 Petitioners contend that the Oldsmobile workers, because they have now been relocated within the Service Plaza complex, should be deemed to "accrete" into the larger group of allegedly unrepresented Service Plaza employees. The Board disagreed, finding instead that the Oldsmobile workers maintained "a sufficient community of interests distinct from those of the [Service Plaza] bargaining unit employees to constitute a separate appropriate unit." Id. at 26, reprinted in J.A. 78.
 
 
 35
 As an initial matter, we note that, because the earlier withdrawal of recognition from the Service Plaza bargaining unit was unlawful, the larger group of employees is not, in fact, "unrepresented," as petitioners assert. Thus, even if the Oldsmobile employees were to become part of the Service Plaza unit, they would not lose Union representation; nor would the employer be relieved of the duty to bargain over their conditions of employment.
 
 
 36
 More importantly, we can find no basis for disturbing the Board's finding that the Oldsmobile employees maintained a separate "community of interests" even after the relocation. Section 9(b) of the NLRA vests in the Board authority to determine "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b) (1994). Moreover, "[t]he Board's discretion in this area is broad, reflecting Congress' recognition of the need for flexibility in shaping the bargaining unit to the particular case." NLRB v. Action Automotive, Inc., 469 U.S. 490, 494, 105 S.Ct. 984, 987, 83 L.Ed.2d 986 (1985) (internal quotation and alteration omitted). Thus, "[t]he Board need only select an appropriate unit, not the most appropriate unit." Cleveland Constr., Inc. v. NLRB, 44 F.3d 1010, 1013 (D.C.Cir.1995) (emphasis added).
 
 
 37
 Given this discretion, there is nothing before the court that would justify reversing the Board's judgment. Petitioners' argument, at bottom, seems to be that, because of the various work location moves initiated by the employers, the appropriate bargaining units were destroyed. However, the premise for this argument is incorrect. As we have already stated, the withdrawal of recognition from the Service Plaza employees was unlawful, and the Oldsmobile employees continued to exist as an appropriate bargaining unit. Thus, petitioners claims are specious.
 
 III. CONCLUSION
 
 38
 For the foregoing reasons, the petition for review and the Board's cross-application for enforcement are granted in part and denied in part.
 
 
 39
 So ordered.