*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KINDRED NURSING CENTERS EAST, LLC, dba
Kindred Transitional Care and Rehabilitation
-Mobile, fka Specialty Healthcare and
Rehabilitation Center of Mobile,
        *Petitioner/Cross-Respondent*,

     *v.*

NATIONAL LABOR RELATIONS BOARD,
        *Respondent/Cross-Petitioner*,

UNITED STEEL, PAPER AND FORESTRY,
RUBBER MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION,
        *Intervenor.*

Nos. 12-1027/1174

On Petition for Review and Cross Application for
Enforcement of a Decision and Order of the
National Labor Relations Board.
No. 15-CA-68248.

Argued: January 23, 2013

Decided and Filed: August 15, 2013

Before: MARTIN and ROGERS, Circuit Judges; TARNOW, District Judge[*]

_____

## COUNSEL

**ARGUED:** Matthew J. Ginsburg, AFL-CIO LEGAL DEPARTMENT, Washington, D.C., for Intervenor. Charles P. Roberts III, CONSTANGY, BROOKS & SMITH, Winston-Salem, North Carolina, for Petitioner/Cross-Respondent. Robert J. Englehart, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** Matthew J. Ginsburg, AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS LEGAL

---

[*] The Honorable Arthur J. Tarnow, Senior District Judge for the Eastern District of Michigan, sitting by designation.

DEPARTMENT, Washington, D.C., for Intervenor.  Charles P. Roberts III, CONSTANGY, BROOKS & SMITH, Winston-Salem, North Carolina, Clifford H. Nelson, Jr., CONSTANGY, BROOKS & SMITH, Atlanta, Georgia, Edward Goddard, KINDRED HEALTHCARE, Wrentham, Massachusetts, for Petitioner/Cross-Respondent.  Robert J. Englehart, Amy H. Ginn, Linda Dreeben, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  Thomas V. Walsh, JACKSON LEWIS LLP, White Plains, New York, Ronald E. Meisburg, James F. Segroves, Lawrence Z. Lorber, PROSKAUER ROSE LLP, Washington, D.C., Mark Theodore, PROSKAUER ROSE LLP, Los Angeles, California, Jonathan C. Fritts, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., Michael J. Hunter, HUNTER, CARNAHAN, SHOUB, BYARD & HARSHMAN, Columbus, Ohio, Ryan Griffin, SERVICE EMPLOYEES INTERNATIONAL UNION, Washington, D.C., Jennifer L. Branch, GERHARDSTEIN & BRANCH CO. LPA, Cincinnati, Ohio, Stefan Marculewicz, LITTLER MENDELSON, P.C., Washington, D.C., David A. Kadela, Tracy Stott Pyles, LITTLER MENDELSON, P.C., Columbus, Ohio, Bernard P. Jeweler, OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., Washington, D.C., G. Roger King, JONES DAY, Columbus, Ohio, R. Scott Medsker, JONES DAY, Washington, D.C., for Amici Curiae.

———————

**OPINION**

———————

BOYCE F. MARTIN, JR., Circuit Judge.  Under federal labor law, workers in the private sector who wish to be represented by a union must petition the National Labor Relations Board to hold an election to determine if a majority of the workers wants union representation.  Federal labor law gives the Board wide discretion to delineate the "bargaining unit," the term for the group of workers that will vote on union representation.  Kindred Nursing Centers East, LLC, a nursing home operator, has petitioned for review of the Board's order that a bargaining unit of Certified Nursing Assistants "constitute[d] an appropriate unit." *Specialty Healthcare and Rehab. Ctr. of Mobile*, 357 N.L.R.B. No. 83, 2011 WL 3916077 at *2 (2011).  The Board has petitioned for enforcement of the order.  The central issue in this case is whether the Board acted within its discretion in deciding *Specialty Healthcare*.  We conclude that it did, and we therefore **DENY** Kindred's petition for review and **GRANT** the Board's cross-petition for enforcement.

We derive the facts in this case from the Board's opinion in *Specialty Healthcare*, 357 N.L.R.B. No. 83, 2011 WL 3916077 (2011), which we will call *Specialty Healthcare II* to distinguish it from the Board's previous case, *Specialty Healthcare*, 356 N.L.R.B. No. 56, 2010 WL 5195445 (2010), which we will call *Specialty Healthcare I.*

Kindred operates a nursing home and rehabilitation center in Mobile, Alabama. *Specialty Healthcare*, 357 N.L.R.B. No. 83, 2011 WL 3916077, at *2 (2011). There is no history of collective bargaining at this nursing home. *Id.* The facility, which the parties agree is a non-acute healthcare facility, consists of four floors and has beds for about 170 residents. *Id.*

Kindred places its employees in one of eight separate departments: nursing, nutrition services, resident activity, maintenance, administration, medical records, central supply, and social services. *Id.* at *3. The facility's executive director is the highest-ranking management official on site. The nursing director and business office manager report to the executive director. *Id.* The individual heads of all but one department report to the nursing director, as do the staffing coordinator, the medical records clerk, and the data entry clerk. *Id.*

The nursing department consists of fifty-three Certified Nursing Assistants (CNAs) not including the Licensed Practical Nurses (LPNs) and Registered Nurses (RNs). *Id.* The LPNs directly supervise the CNAs on each nursing wing. *Id.* The RNs supervise the LPNs and report to the nursing director. *Id.* The CNAs work one of three eight-hour shifts and work directly with up to seventeen residents each. *Id.* Kindred typically assigns three to five CNAs to work on each nursing floor and usually assigns each CNA to work in a particular area of a nursing floor. *Id.*

As for job duties, CNAs help residents with daily functions, such as grooming, oral hygiene, bathing and dressing, and incontinence care. *Id.* CNAs get food trays for residents who have their meals on a nursing floor and help these residents eat. *Id.* CNAs turn and lift residents in their beds, move residents to their wheelchairs, assist with walking short distances, and help them get around the facility. *Id.* CNAs also

accompany residents to appointments outside the nursing home. *Id.* CNAs take residents' vital signs and monitor their daily food and fluid intake and output. *Id.* CNAs complete an "Activities for Daily Living" flow sheet on which they record the residents' vital signs and daily functions and activities, such as bathing, dressing, and walking. *Id.* CNAs also note on their medical charts the services and therapies that residents receive, and note residents' progress or lack thereof. *Id.* CNAs are the only employees other than the RNs and LPNs who are certified or licensed to provide certain aspects of residents' care, such as feeding and positioning. *Id.*

Kindred has designated several CNAs as "restorative CNAs" who help residents in therapeutic programs to maintain functions such as walking and eating or to increase their range of motion. *Id.* The restorative CNAs also help residents with their meals in the dining room and transport them back to their rooms after therapeutic activities or meals. *Id.*

When a new resident comes to the nursing home, an interdisciplinary team of employees from the nursing, nutrition-services, resident-activity, and social-services departments assesses the new resident's medical, dietary, and social needs. *Id.* The CNAs attend these meetings and contribute to formulating the new resident's care plan. *Id.* CNAs may also attend additional meetings of the interdisciplinary team if a resident's care plan needs to be changed. *Id.* CNAs also attend in-service training sessions. *Id.*

The CNAs retrieve food carts from the first floor kitchen and take them to their assigned nursing floors for residents who eat meals in their rooms or on their floor's sun porch. *Id.* at *4. CNAs may contact the central-supply clerk if there is a shortage of supplies on the floor, and the clerk may contact a CNA if the clerk has a question about specific items that a resident under the CNA's care may need. *Id.* The social-services assistant may contact the CNA to get certain information about a resident, such as whether the resident met with a particular doctor. *Id.*

Kindred prefers that its CNAs have a high-school diploma. *Id.* CNAs must be certified by the state, with certification requiring completion of sixteen hours of

classroom training and seventy-two hours of general education. *Id.* The certification course includes the basic components of caring for geriatric and incapacitated patients, such as bathing, dressing, feeding, and the like. *Id.* To maintain their certification, the state requires CNAs to periodically attend specialized training. *Id.*

Kindred pays the CNAs a starting wage of $8.50 per hour, and may pay them raises of ten cents per hour for each year of experience up to fifteen years. *Id.* Kindred pays the CNAs time-and-a-half for overtime work. *Id.* The CNAs' immediate supervisors evaluate the CNAs annually; the evaluation provides the basis for possible pay increases (typically three percent) that the nursing home's executive director must approve. *Id.* The CNAs wear the same uniforms as the LPNs and RNs. *Id.* The Board stated that the record did not show that any employees from other classifications had transferred into a CNA position, although the record did show that one CNA transferred to a unit-clerk position. *Id.*

Kindred sought to include in the bargaining unit with the CNAs about thirty-three other employees whom it deems service and maintenance employees. *Id.* These employees include: resident activity assistants, who design and lead individual and group recreational activities for the residents; the social services assistant, who works with residents and their families to identify residents' needs and to resolve problems as they arise; the staffing coordinator, who prepares work schedules for the nursing staff, contacts replacement personnel as necessary, and determines which CNA will accompany a resident to an appointment outside the nursing home; the maintenance assistant, who performs routine maintenance, upkeep, and repair services on the building, grounds and equipment; and the central-supply clerk, who maintains an inventory of items used by each resident, and orders, receives, and stocks supplies. *Id.*

Kindred would also include: cooks, who prepare meals for residents; dietary aides, who assist cooks and deliver prepared food to the dining room or the nursing floors; the medical-records clerk, who creates and maintains residents' medical records and prepares correspondence and reports; the data-entry clerk, who inputs in the employer's electronic-records system the residents' care plans, physicians' orders,

resident-cash logs and financial charges, and other resident information; a business-office clerical; and a receptionist. *Id.* The Board noted that the record contained no information about the business-office clerical or the receptionist. *Id.* at *20 n.4.

In general, the employees Kindred seeks to include in the bargaining unit report to the managers of their respective departments. *Id.* at *5. The managers of all but one of these departments report directly to the director of nursing. *Id.* None of the other employees are in the nursing department and therefore none report to the RNs. *Id.* Most of the classifications Kindred seeks to add to the bargaining unit have similar educational requirements. *Id.* For example, cooks and dietary aids must have completed the tenth grade. *Id.* Cooks must have a certification from the state, which they can get by successfully completing a course taught by the local health department. *Id.* at *20 n.5. Employees in the remaining classifications must have a high-school degree or its equivalent. *Id.* at *5. Activities assistants typically have only a high-school diploma even though the job description states that the position requires a bachelor's degree. *Id.* at *20 n.6. The employer requires all employees to complete the same employment application, go through the same hiring process, pass a drug test, and go through the same new employee orientation. *Id.* at *5.

Kindred's nursing home's normal business hours are 8 a.m. to 4:30 p.m. *Id.* Cooks and dietary aides typically work either of two shifts to cover the three daily meals, with the first shift starting between 5 to 6 a.m. and covering breakfast and lunch, and the later shift covering lunch and dinner. *Id.* One activity assistant works normal business hours, while the other staggers her time to accommodate residents' after-dinner activities, which can run as late as 8 p.m. *Id.* The maintenance assistant works 7 a.m. to 3 p.m. *Id.* None of the other employees staff the three 8-hour shifts that the CNAs staff. *Id.* The employer pays all employees hourly and on a bi-weekly basis. *Id.* The starting hourly wage rates are: $7 for dietary aides; $9 for cooks and the receptionist; $10 for the central supply and medical records clerks and the staffing coordinator; and $15 for the data entry clerk. *Id.*

Like the CNAs, Kindred gives these employees annual evaluations under the same appraisal system, and gives them the opportunity for wage increases based on favorable evaluations. *Id.* The employer makes all employees eligible for the same benefits, such as: health and life insurance; retirement and profit-sharing plans; sick leave and vacations; tuition reimbursement; and performance-based special awards programs. *Id.* Kindred subjects all employees to the same personnel policies and employee handbook. *Id.* Furthermore, all employees may purchase meals in the dining room at the same prices; they all wear name badges; use the same parking lot, time clock, break room, smoking area and bulletin boards; attend regular monthly meetings as well as occasional group meetings and in-service training sessions; and are invited to attend the annual holiday party and other social functions. *Id.* Dietary aides and the maintenance assistant wear uniforms, but the uniform differs from the uniforms the CNAs, LPNs, and RNs wear. *Id.*

The union petitioned to represent a unit of fifty-three full-time and regular part-time CNAs. *Id*. at *2. At a proceeding before a hearing officer of the Board's Region 15, Kindred argued that the bargaining unit should be expanded to include an additional eighty-six non-supervisory, non-professional service and maintenance employees. *Id.* Afterwards, Region 15's Regional Director issued a Decision and Direction of Election in this proceeding, finding that the petitioned-for unit of full-time and regular part-time CNAs at the employer's nursing home and rehabilitation facility constituted an appropriate unit in which to conduct an election. *Id.* at *1. The Region held the election, and the union won. *Id*. Afterwards, Kindred filed a timely request for Board review of the Regional Director's decision, arguing that the Regional Director had erred in finding the petitioned-for unit appropriate. *Id.* The Board granted review. *Id.*

Afterwards, in *Specialty Healthcare I*, the Board invited the parties in the case and interested amici to file briefs to address the issues raised in the case. The Board asked the parties and amici to address in their briefs some or all of the following eight questions: (1) What had been their experience applying the "pragmatic or empirical community of interests approach" of *Park Manor Care Center*, 305 N.L.R.B. 872 (1991)

and subsequent cases?; (2) What factual patterns had emerged in non-acute healthcare facilities illustrating what units are typically appropriate?; (3) How had applying *Park Manor* hindered or encouraged employee free choice and collective bargaining in non-acute healthcare facilities?; (4) How should the rules for appropriate units in acute health care facilities set forth in Section 103.30 be used in determining the appropriateness of the proposed units in non-acute healthcare facilities?; (5) Would the proposed unit of CNAs be appropriate under *Park Manor?*; (6) If such a unit would not be appropriate under *Park Manor*, should the Board reconsider the test set forth in *Park Manor?*; (7) Where there is no history of collective bargaining, should the Board hold that a unit of all employees performing the same job at a single facility is presumptively appropriate in non-acute healthcare facilities?; (8) Should the Board find a proposed unit appropriate if, as found in *American Cyanamid Co.*, 131 N.L.R.B. 909, 910 (1961), the employees in the proposed unit are "readily identifiable as a group whose similarity of function and skills create a community of interest."? *Specialty Healthcare I* at *2. The employer and amici then filed briefs.

The Board then decided the case before us, *Specialty Healthcare II*, which purported to do three things: (1) overrule *Park Manor Care Center*, 305 N.L.R.B. No. 135 (1991), a test the Board had applied to determine the appropriateness of a bargaining unit in a nursing home; (2) return to applying the "traditional community-of-interest approach" to nursing homes; and (3):

> reiterate and clarify that, in cases in which a party contends that a petitioned-for unit containing employees *readily identifiable* as a group who share a community of interest is nevertheless inappropriate because it does not contain additional employees, the burden is on the party so contending to demonstrate that the excluded employees share an *overwhelming community of interest* with the included employees.

*Specialty Healthcare II*, 357 N.L.R.B. No. 83, 2011 WL 3916077, at *1 (2011) (emphasis added).

Kindred refused to bargain. The union filed an unfair-labor-practice charge, and the Board found that Kindred had violated the Act. An employer cannot get direct

judicial review of the Board's bargaining unit determination—instead, it must refuse to bargain with the union and then raise the issue of the unit's appropriateness in a subsequent unfair-labor-practice proceeding. *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 154 (1941) ("While the ruling of the Board determining the appropriate unit for bargaining is not subject to direct review under the statute, the ruling is subject to challenge when, as here, a complaint of unfair practices is made predicated upon the ruling.") (citing *Am. Fed'n of Labor v. N.L.R.B.*, 308 U.S. 401, 408–11 (1940)). Kindred then appealed the Board's decision to this court pursuant to 29 U.S.C. section 160(f). We have jurisdiction over this case—even though it arose outside our Circuit—because of section 160(f)'s quirk that allows review in the Circuit in which the person aggrieved by the Board's order resides or transacts business. 29 U.S.C. § 160(f). Kindred's corporate headquarters are in Louisville, KY. Therefore, we have jurisdiction over this appeal.

We must uphold the Board's bargaining-unit determination "unless the employer establishes that it is arbitrary, unreasonable, or an abuse of discretion." *Mitchellace, Inc. v. N.L.R.B.*, 90 F.3d 1150, 1157 (6th Cir. 1996) (citing *Bry-Fern Care Ctr., Inc. v. N.L.R.B.*, 21 F.3d 706, 709 (6th Cir. 1994); *N.L.R.B. v. Hardy-Herpolsheimer*, 453 F.2d 877, 878 (6th Cir. 1972)). We review deferentially the Board's determination of an appropriate bargaining unit because "[t]he Board has wide discretion in determining the limits of an appropriate bargaining unit." *Indianapolis Glove Co., Inc. v. N.L.R.B.*, 400 F.2d 363, 367 (6th Cir. 1968). We have even gone so far as to say that "[n]ormally the Board exercises a discretion bordering on finality in determining the unit appropriate for bargaining under Section 9(b) of the Act, 29 U.S.C. 159(b)." *Uyeda v. Brooks*, 365 F.2d 326, 330 (6th Cir. 1966) (citations omitted).

Furthermore, we must uphold the Board's interpretation of the Act if it is "reasonably defensible[;]" we may not reject the Board's interpretation "merely because the courts might prefer another view of the statute." *Ford Motor Co. v. N.L.R.B.*, 441 U.S. 488, 497 (1979) (citing *N.L.R.B. v. Iron Workers*, 434 U.S. 335, 350 (1978)). In exercising its discretion, however, the Board "must cogently explain why it has

exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) (citations omitted).

On appeal, Kindred does not argue that the Board has abused its discretion in overruling *Park Manor*, which it says is a "non-issue." Rather, Kindred argues that the Board has abused its discretion because *Specialty Healthcare II* does the following four things: (1) adopts a new approach and does not return to applying the traditional community-of-interest approach; (2) does not "reiterate and clarify" the law by adopting the overwhelming-community-of-interest test, but inappropriately imports this test from another area of labor law; (3) violates section 9(c)(5) of the National Labor Relations Act in its application of the traditional community of interest test and adoption of the overwhelming-community-of-interest test; and (4) makes all of these changes through adjudication instead of rulemaking. We address each argument in turn.

First, we address Kindred's argument that *Specialty Healthcare II* adopts a new approach and does not return to applying the traditional community-of-interest approach. Kindred argues that *Specialty Healthcare II* represents a material change in the Board's jurisprudence under section 9 of the Act.

Section 9(b) of the Act gives the Board wide discretion to determine an appropriate bargaining unit, providing that "[t]he Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof[.]" 29 U.S.C. § 159(b). The United States Supreme Court has consistently held that "[s]ection 9(b) of the Act confers upon the Board a broad discretion to determine appropriate units." *Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491 (1947). The Board's discretion is broad indeed; the Court has stated that "[t]he issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision[,]" because "[i]t involves of necessity a large measure of informed discretion and the decision of the Board, if not final, is rarely to be disturbed." *Id.* As the Court observed more recently, a court is "not authorized to bind

the Board in ways not mandated by Congress." *NLRB v. Action Auto., Inc.*, 469 U.S. 490, 497 (1985).

Because of the wide discretion given to the Board by statute, judicial review of bargaining-unit determinations is indeed limited.  Therefore, we have held that, "[i]n making a unit determination, the Board must select an 'appropriate' bargaining unit[,]" among what is often a range of appropriate bargaining units, such that "'the Board is not required to select the *most* appropriate unit.'" *NLRB v. ADT Sec. Servs., Inc.*, 689 F.3d 628, 633 (6th Cir. 2012) (quoting *Bry-Fern*, 21 F.3d at 709 (citing *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 610 (1991))).  We are not the only court to take a deferential approach.  Judge Posner remarked that "[t]he courts' obeisant attitude" towards the Board's unit determinations "is epitomized by the frequent statement that the Board need only choose an appropriate unit—its choice need not be the most appropriate unit." *Cont'l Web Press, Inc. v. NLRB*, 742 F.2d 1087, 1089 (7th Cir. 1984) (citations omitted).

Although section 9(b) provides no other guidance on how the Board should use its authority to determine whether a bargaining unit is appropriate, "[t]he Board does not exercise this authority aimlessly; in defining bargaining units, its focus is on whether the employees share 'a community of interest.'" *Action Auto., Inc.*, 469 U.S. at 494 (1985) (citations omitted).  The community-of-interest test "requires simply that groups of employees in the same bargaining unit 'share a community of interests sufficient to justify their mutual inclusion in a single bargaining unit.'" *ADT Security Servs.*, 689 F.3d at 633 (quoting *Bry-Fern*, 21 F.3d at 709).  The test includes the following five factors: "(1) similarity in skills, interests, duties and working conditions; (2) functional integration of the plant, including interchange and contact among the employees; (3) the employer's organization and supervisory structure; (4) the bargaining history; and (5) the extent of union organization among the employees." *Id.* at 633-34 (quoting *Bry-Fern*, 21 F.3d at 709).

Following the United States Supreme Court, we have held that "[i]t is within the Board's purview . . . to develop standards for ascertaining whether one unit is more appropriate than another." *ADT Security Servs.*, 689 F.3d at 636 (citing *Am. Hosp. Ass'n*,

499 U.S. at 611–12).  It follows, then, that it is within the Board's purview to choose to follow one of its precedents or reject another.  An agency may depart from its precedents, and provided that "the departure from precedent is explained, our review is limited to whether the rationale is so unreasonable as to be arbitrary and capricious." *State of Mich. v. Thomas*, 805 F.2d 176, 184 (6th Cir. 1986) (citing *West Coast Media, Inc. v. F.C.C.*, 695 F.2d 617, 620–21 (D.C.Cir. 1982), *cert. denied*, 464 U.S. 816 (1983)).  "An administrative agency may reexamine its prior decisions and may depart from its precedents provided the departure is explicitly and rationally justified." *Id.* (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) (plurality opinion); *Ohio Fast Freight, Inc. v. United States*, 574 F.2d 316, 319 (6th Cir. 1978); *Am. Trucking Ass'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 416 (1967) (administrative agencies are "neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.")).

Here, the Board has cogently explained why it adopted the approach it did in *Specialty Healthcare II.*  The Board explained that the "first and central right set forth in Section 7 of the Act is the employees' 'right to self-organization.'" *Specialty Healthcare II*, 357 N.L.R.B. No. 83, 2011 WL 3916077, at * 12.  The Board further explained that "'[s]ection 9(b) of the Act directs the Board to make appropriate unit determinations which will 'assure to employees the fullest freedom in exercising rights guaranteed by this Act.' i.e. the rights of self-organization and collective bargaining.'" *Id.* (quoting *Fed. Elec. Corp.*, 157 N.L.R.B. 1130, 1132 (1966)).  If the Board believes that it can best fulfill its statutory duty by adopting a test from one of its precedents over another, then the Board does not abuse its discretion.  Indeed, it is a general tenet of administrative law that "[a]n agency's interpretation of its own precedents receives considerable deference" from a reviewing court. *Aburto-Rocha v. Mukasey*, 535 F.3d 500, 503 (6th Cir. 2008) (citing *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 799 (D.C.Cir.2007)).

Moreover, in *Specialty Healthcare I*, the Board did explain why it might be modifying its approach to initial bargaining-unit determinations by stating that its

standards for determining if a proposed unit is an appropriate unit have, in the long-term care industry and more generally, "long been criticized as a source of unnecessary litigation." *Specialty Healthcare I*, 356 N.L.R.B. No. 56, 2010 WL 5195445, at *4 (2010). The Board quoted the bipartisan Commission on the Future of Worker-Management Relations as having reported, in 1994, that "parties engage in litigation over the scope of the unit for tactical purposes such as to delay an election." *Id.* Yet the Board itself has often recognized the "'Act's policy of expeditiously resolving questions concerning representation.'" *Id.* (quoting *Northeastern University*, 261 NLRB 1001, 1002 (1982)).

Because *Specialty Healthcare II* adopted a community-of-interest test based on some of the Board's prior precedents, and because it did explain its reasons for doing so, the Board did not abuse its discretion in applying a version of its traditional community-of-interest test to find a CNA-only bargaining unit to be appropriate. Rather, *Specialty Healthcare II* clarified the community-of-interest test, which Judge Posner in one case criticized as providing "little direction" and about which he expressed the wish that the Board would give "a precise meaning[.]" *Cont'l Web Press*, 742 F.2d at 1090. The Board did not abuse its discretion in clarifying the community-of-interest test.

We turn now to Kindred's argument that the Board abused its discretion in *Specialty Healthcare II*'s adoption of the overwhelming-community-of-interest test. *Specialty Healthcare II* also purported to clarify the showing that an employer must make if, after the Board's initial unit determination, the employer argues that the proposed unit must include more workers. *Specialty Healthcare II* claimed to "reiterate and clarify" that:

> in cases in which a party contends that a petitioned-for unit containing employees readily identifiable as a group who share a community of interest is nevertheless inappropriate because it does not contain additional employees, the burden is on the party so contending to demonstrate that the excluded employees share an *overwhelming community of interest* with the included employees.

*Specialty Healthcare II*, 357 N.L.R.B. No. 83, 2011 WL 3916077, at *1 (2011) (emphasis added).  Kindred argues that this overwhelming-community-of-interest standard represents a "material change in the law" and is not a mere reiteration nor clarification.  But this is just not so.  The Board has used the overwhelming-community-of-interest standard before, so its adoption in *Specialty Healthcare II* is not new.

For example, in *Jewish Hosp. Ass'n of Cincinnati*, 223 N.L.R.B. 614, 617 (1976), the Board held that a unit limited to service employees was inappropriate because of their "overwhelming community of interest" with maintenance employees.  In *Lodgian, Inc.*, 332 N.L.R.B. 1246, 1255 (2000), the Regional Director required inclusion in a unit employees who shared "an overwhelming community of interest with the employees" whom the union sought to represent.

Moreover, as the Board explained in *Specialty Healthcare II*, not only has the Board used this test before, but the District of Columbia Circuit approved of the Board's use of it in *Blue Man Vegas, LLC v. N.L.R.B.*, 529 F.3d 417 (D.C. Cir. 2008), which denied review of the employer's challenge to a bargaining-unit determination and enforced the Board's order.

In *Blue Man*, the union proposed a bargaining unit that excluded some employees.  *Id*. at 420.  Although the employer argued that the excluded employees should be included in the proposed bargaining unit, the Regional Director approved the unit as the union had petitioned.  *Id.*  The court said that if the employer wants to successfully challenge the unit by arguing that it should include more employees, then "the employer must do more than show there is another appropriate unit because 'more than one appropriate bargaining unit logically can be defined in any particular factual setting.'"  *Id.* at 421 (quoting *Country Ford Trucks, Inc. v. N.L.R.B.*, 229 F.3d 1184, 1189 (D.C. Cir. 2000)).  Rather, the employer's burden is to show that the prima facie unit is truly inappropriate.  *Id.*  (citing *Country Ford Trucks,* 229 F.3d at 1189; *Dunbar Armored, Inc. v. N.L.R.B.*, 186 F.3d 844, 847 (7th Cir. 1999); *Serramonte Oldsmobile, Inc. v. N.L.R.B.*, 86 F.3d 227, 236 (D.C. Cir. 1996)).  The court explained that a unit would be truly inappropriate if, for example, there were no legitimate basis upon which

to exclude certain employees from it.  *Id.*  The court further explained that even if the excluded employees shared a community of interest with the included employees, this would not mean that there would be no legitimate basis upon which to exclude them. *Id.*  If the only appropriate bargaining unit were required to include all employees that shared a community of interest, then there could be only one appropriate bargaining unit—and nothing in the Act specifies this.  *Id.*  The court then explained that if the excluded employees shared "an *overwhelming community of interest* with the included employees, then there [would be] no legitimate basis upon which to exclude them from the bargaining unit."  *Id.*  (emphasis added).

*Specialty Healthcare II* adopted this standard, quoting *Blue Man* for the rule that "the proponent of the larger unit must demonstrate that employees in the more encompassing unit share 'an overwhelming community of interest' such that there 'is no legitimate basis upon which to exclude certain employees from it.'"  *Specialty Healthcare II*, 357 N.L.R.B. No. 83, 2011 WL 3916077, at \*16 (2011) (quoting *Blue Man*, 529 F.3d at 421).  If, in doing so, the Board overruled some of its precedents and chose to follow a precedent approved by the *Blue Man* court, the Board may do so, provided that it explains why.

In *Specialty Healthcare II*, the Board did cogently explain its reasons for adopting the overwhelming-community-of-interest standard.  The Board explained the need to clarify its law, acknowledging that it had used some variation of a heightened standard when a party (usually an employer) argues that the bargaining unit should include more employees.  The Board explained that it "has sometimes used different words to describe this standard and has sometimes decided cases such as this without articulating any clear standard."  *Specialty Healthcare II*, 357 N.L.R.B. No. 83, 2011 WL 3916077, at \*17 (2011).

For example, in one case, the Board used the phrase "*sufficiently distinct* community of interest."  *Id.*  (quoting *Seaboard Marine*, 327 NLRB 556, 556 (1999)) (emphasis added).  In another case, the Board held that a proposed unit was "'too narrow in scope in that it exclude[d] employees who share[d] a *substantial* community of

interest with employees in the unit sought.'" *Id.* (quoting *Colorado Nat'l Bank of Denver*, 204 N.L.R.B. 243, 243 (1973) (emphasis added and footnote omitted by *Specialty Healthcare II* opinion)). *Specialty Healthcare II* explained that "the use of slightly varying verbal formulations to describe the standard applicable in this recurring situation does not serve the statutory purpose "to assure to employees the fullest freedom in exercising the rights guaranteed by th[e] Act." *Id.* at *17. Nor, the Board continued, does the use of slightly varying verbal formations "permit employers to order their operations with a view toward productive collective bargaining should employees choose to be represented." *Id.* It is not an abuse of discretion for the Board to take an earlier precedent that applied a certain test and to clarify that the Board will adhere to this test going forward.

Furthermore, the Board acknowledged that its prior decisions did not expressly impose the burden of proof on the party arguing that the petitioned-for unit was inappropriate because the smallest appropriate unit would contain additional employees. *Id.* at *20, n.28. But, the Board explained that allocating the burden in this manner is appropriate for several reasons, one of which is that the employer is in "full and often near-exclusive possession of the relevant evidence." *Id.* The Board noted that it has allocated the burden of proof for this reason in defining the scope of appropriate units both pre- and post-election. *Id.* In support, the Board quoted *Capri Sun*, 330 N.L.R.B. 1124, 1126 n.8 (2000), as saying that it is "'the [e]mployer that possesses and maintains the records which would support its assertions. In these circumstances, the burden to establish the time fame of the transfers is on the employer.'" *Id.* The Board quoted *Harold J. Becker Co.*, 343 N.L.R.B. 51, 52 (2004), as saying that, when an employer argued that employees should be included in the unit as dual-function employees, the Board held it was "the [e]mployer, of course, who [was] in the best position to establish that status, because it ha[d] superior access to the relevant information." *Id.* Because the overwhelming-community-of-interest standard is based on some of the Board's prior precedents, has been approved by the District of Columbia Circuit, and because the Board did cogently explain its reasons for adopting the standard, the Board did not abuse its discretion in applying this standard in *Specialty Healthcare II*.

We now turn to Kindred's argument that *Specialty Healthcare II*'s application of either the *American Cyanamid* community-of-interest test, or of the overwhelming-community-of interest test, violates section 9(c)(5) of the Act by making it impossible for an employer to challenge the petitioned-for unit.  In section 9(c)(5), Congress provided a statutory limit on the Board's discretion to define collective-bargaining units. Section 9(c)(5) states that "the extent to which the employees have organized shall not be controlling" in determining whether a unit is appropriate.  29 U.S.C. § 159(c)(5).  The Supreme Court has interpreted section 9(c)(5) as showing Congress' intent to prevent the Board from determining bargaining units based solely upon the extent of organization, while at the same time allowing the Board to consider "the extent of organization as one factor, though not the *controlling* factor, in its unit determination." *N.L.R.B. v. Metro. Life Ins. Co.*, 380 U.S. 438, 441-42 (1965) (footnote omitted; emphasis added).

But courts have struggled with what Congress meant by this provision; one court even famously commented that "[s]ection 9(c)(5), with its ambiguous word 'controlling,' contains a warning to the Board almost too Delphic to be characterized as a standard." *Local 1325, Retail Clerks Int'l Ass'n, AFL-CIO v. N.L.R.B.*, 414 F.2d 1194, 1199 (D.C. Cir. 1969).  Nevertheless, the court added, section 9(c)(5) "has generally been thought to mean that there must be substantial factors, apart from the extent of union organization, which support the appropriateness of a unit, although extent of organization may be considered by the Board and, in a close case, presumably may make the difference in the outcome."  *Id.* at 1199–200.

Section 9(c)(5) appears to have been added to prevent the Board from deciding cases like *Botany Worsted Mills*, 27 N.L.R.B. 687 (1940), in which the Board deemed a bargaining unit appropriate without applying any kind of community-of-interest analysis, but solely on the basis that the workers wanted to organize a union.  The Board at that time acted as a union partisan, encouraging organizing.  In *Botany Worsted Mills*, the Board explained, in the course of deeming that a bargaining unit of workers in two job classifications (wool sorters and trappers) constituted an appropriate bargaining unit,

that "[w]herever possible, it is obviously desirable that, in a determination of the appropriate unit, [it] render collective bargaining of the [c]ompany's employees an immediate possibility." *Botany Worsted Mills*, 27 N.L.R.B. at 690. The Board thus made clear that it based its determination that the bargaining unit was appropriate on the mere fact that the employees wanted to engage in collective bargaining. The Board observed that there was "no evidence that the majority of the other employees of the [c]ompany belong[ed] to any union whatsoever; nor has any other labor organization petitioned the Board for certification as representative of the [c]ompany's employees on a plant-wide basis." *Id.* The Board said that "[c]onsequently, even if, under other circumstances, the wool sorters or trappers would not constitute the most effective bargaining unit, nevertheless, in the existing circumstances, unless they are recognized as a separate unit, there will be no collective bargaining agent whatsoever for these workers." *Id.* The Board concluded by stating that "in view of the existing state of labor organization among the employees of the [c]ompany, in order to insure to the sorters or trappers the full benefit of their right to self-organization and collective bargaining and otherwise to effectuate the policies of the Act," it found that the wool sorters or trappers of the company "constituted an appropriate bargaining unit." *Id.* Kindred characterizes *Specialty Healthcare II*'s certification of a CNA-only unit as "a throw-back to the discredited *Botany Worsted Mills* analysis."

But Kindred's argument misses the mark, because here, in *Specialty Healthcare II*, the Board did not assume that the CNA-only unit was appropriate. Instead, it applied the community-of-interest test from *American Cyanamid* to find that there were substantial factors establishing that the CNAs shared a community of interest and therefore constituted an appropriate unit—aside from the fact that the union had organized it. Indeed, nowhere in its briefs, nor before the Board, did Kindred dispute that the CNAs shared a community of interest. Therefore, the Board's approach in *Specialty Healthcare II* did not violate section 9(c)(5).

Nor does the overwhelming-community-of-interest test violate section 9(c)(5). In this regard, we find persuasive the District of Columbia Circuit's analysis in *Blue*

*Man*, which *Specialty Healthcare II* relied upon and quoted as holding that "'[a]s long as the Board applies the overwhelming community of interest standard *only after* the proposed unit has been shown to be *prima facie* appropriate, the Board does not run afoul of the statutory injunction that the extent of the union's organization not be given controlling weight.'" *Specialty Healthcare II*, 357 N.L.R.B. No. 83, 2011 WL 3916077 at *20 n.25 (quoting *Blue Man*, 529 F.3d at 423) (emphasis added).

Here, in *Specialty Healthcare II*, the Board followed the *Blue Man* approach, conducting its community-of-interest inquiry before requiring Kindred to show that the other employees shared an overwhelming community of interest with the CNAs. It would appear, then, that *Specialty Healthcare II* does not violate section 9(c)(5) of the Act.

Lastly, we address Kindred's argument that the Board abused its discretion by making policy through adjudication rather than through notice-and-comment rulemaking. Kindred argues that the Board must follow notice-and-comment rulemaking if it wants to create a generally applicable rule for how the Board will determine an appropriate bargaining unit. But the Board did not abuse its discretion in adopting a generally applicable rule through adjudication instead of rulemaking because *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974), holds both that "the Board is not precluded from announcing new principles in an adjudicative proceeding and that the choice between rulemaking and adjudication lies in the first instance within the Board's discretion." Therefore, if the Board may announce a new principle in an adjudication, it follows that it may choose to follow one of its already existing principles. The United States Supreme Court did add that "there may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act." *Id.* at 294. But Kindred has not explained why the Board's election of adjudication in this case amounted to an abuse of discretion or a violation of the Act. Moreover, as described above, the Board did solicit briefs from the parties and the general public, thereby providing for the opportunity for the public's input, which is one

of the hallmarks of notice-and-comment rulemaking under the Administrative Procedure Act.

We **DENY** Kindred's petition for review and **GRANT** the Board's cross-petition for enforcement.