*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 12a0365p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOSEPH MONTAGUE and KENNETH GRAY,

Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

INTERNATIONAL UNION, UNITED
AUTOMOBILE, AEROSPACE AND
AGRICULTURAL IMPLEMENT WORKERS OF
AMERICA and DANA COMPANIES, LLC,

*Intervenors.*

No. 11-1256

_____

On Petition for Review from the National Labor Relations Board.
Nos. 7-CB-14120; 7-CB-14119; 7-CB-14083; 7-CA-47079;
7-CA-47078; 7-CA-46965.

Argued: June 6, 2012

Decided and Filed: August 23, 2012[*]

Before: GIBBONS, ROGERS, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** William L. Messenger, NATIONAL RIGHT TO WORK LEGAL
DEFENSE FOUNDATION, Springfield, Virginia, for Petitioners. Elizabeth Ann
Heaney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Respondent. Michael Brendan Nicholson, INTERNATIONAL UNION, UAW, Detroit,
Michigan, for Intervenors. **ON BRIEF:** William L. Messenger, NATIONAL RIGHT
TO WORK LEGAL DEFENSE FOUNDATION, Springfield, Virginia, for Petitioners.
Elizabeth Ann Heaney, Julie B. Broido, Linda Dreeben, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for Respondent. Michael Brendan

_____

[*]This decision was originally issued as an "unpublished decision" filed on August 23, 2012. The
court has now designated the opinion as one recommended for full-text publication.

Nicholson, Blair Katherine Simmons, INTERNATIONAL UNION, UAW, Detroit, Michigan, James B. Coppess, AFL-CIO LEGAL DEPARTMENT, Washington, D.C., Stanley J. Brown, HOGAN LOVELLS US LLP, New York, New York, Christine Michalopoulos Burke, HOGAN LOVELLS US LLP, McLean, Virginia, for Intervenors. Samuel Estreicher, JONES DAY, New York, New York, for Amici Curiae.

––––––––––––––––

**OPINION**

––––––––––––––––

ROGERS, Circuit Judge.   This case raises the question of whether—before employees officially recognize a union—a union and an employer may enter into a letter of agreement setting forth general terms, including provisions related to health care benefits and future collective-bargaining agreements, that are subject to further negotiation but may become binding if arbitration is necessary.  Because the National Labor Relations Board, which sets labor policy, reasonably determined that the agreement did not impermissibly restrict employee choice, we uphold the Board's dismissal of the petitioners' complaint.

Dana Companies, the employer in this case, is an automotive parts manufacturer with about 90 facilities throughout the United States, Canada, and 30 other countries. Dana entered into discussions with the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, AFL-CIO (UAW) about potentially representing approximately 305 employees at Dana's St. Johns, Michigan facility.  Dana and the UAW had had a long-standing bargaining relationship before discussions about the St. Johns facility began, and the UAW already represented 2,200 to 2,300 Dana employees at various locations. *Dana Corp.*, 356 NLRB 49, at *1 (2010).

On August 6, 2003, Dana and the UAW entered into the Letter of Agreement (LOA) that is at the heart of this appeal, which included various provisions intended to manage the relationship between the parties should the majority of St. Johns employees select the UAW as their exclusive collective-bargaining representative.

The LOA included a statement of purpose recognizing that the challenges of the automotive industry would "be more effectively met through a partnership [with the union] that is more positive, non-adversarial and with constructive attitudes." The statement of purpose also reiterated that an "[e]mployee's freedom to choose is a paramount concern of Dana as well as the UAW," and both parties agreed to "not allow anyone to be intimidated or coerced into a decision [when selecting their exclusive bargaining representative]." The LOA further stated that:

> The parties understand that the Company may not recognize the Union as the exclusive representative of employees in the absence of showing that a majority of the employees in an appropriate bargaining unit have expressed their desire to be represented by the Union.

LOA, Article 3.1.

In the LOA, Dana undertook to be neutral in the event of an organizing campaign, and to: (1) allow the employees to meet on company property, Article 2.1.3.5; (2) refrain from discussing any "potential negative effects or results of representation by the Union on the Company," Article 2.1.2.7; (3) provide the Union "with access to employees during the workday in non-workday areas," Article 2.1.3.5; and (4) provide the UAW with personal information about the employees targeted for unionization, Article 2.1.3.1. The LOA also provided for a card check process by a neutral third party as the procedure for recognizing when the union received the support of the majority of the employees, Article 3. In addition, the parties consented to a no-strike/no-lockout commitment, Article 6, at least until the first formal collective-bargaining agreement was finalized.

Most central to the issues in this case, the LOA also described certain principles that were to be included in future bargaining agreements between the parties. With regard to health care, Article 4 contained a commitment by the union that bargaining would not erode "current solutions and concepts already in place or scheduled to be implemented January 1, 2004," including "premium sharing, deductibles, and out of pocket maximums." The LOA also contained the parties' agreement "that in labor

agreements bargained pursuant to this Letter, the following conditions must be included for the facility to have a reasonable opportunity to succeed and grow":

•      Health care costs that reflect the competitive reality of the supplier industry and product(s) involved
•      Minimum classifications
•      Team-based approaches
•      The importance of attendance to productivity and quality
•      Dana's idea program (two ideas per person per month and 80% implementation)
•      Continuous improvement
•      Flexible compensation
•      Mandatory overtime when necessary (after qualified volunteers) to support the customer

Article 4.2.4. Dana and the union agreed that if they did not reach an agreement on any of the terms for the first formal contract, including those discussed in Article 4.2.4, within six months, they would submit the unresolved issues to arbitration with a neutral arbitrator according to Articles 4.2.5 and 4.2.6. For any potential violations of the LOA itself, Article 5 established a dispute resolution procedure where a neutral arbitrator was empowered to issue "final and binding" decisions.

On August 13, 2003, Dana issued a press release that it had reached a "partnership agreement" with the UAW. According to the Board's decision, there is nothing in the record regarding to what extent the press release and the LOA were made available to Dana's employees. *Dana Corp.*, 356 NLRB49, at *2.

In December 2003, the UAW requested a list of employees working at the St. Johns facility, pursuant to Article 2.1.3.1. This prompted petitioners, Joseph Montague and Kenneth Gray, to file unfair labor charges. On September 30, 2004, the General Counsel of the NLRB issued a complaint alleging that by entering into the LOA Dana had rendered unlawful assistance to the UAW in violation of §§ 8(a)(2) and (1) of the National Labor Relations Act (NLRA), and that the UAW had restrained and coerced employees regarding their choice of exclusive bargaining representative in violation of § 8(b)(1)(A). At no time prior to or during the litigation of this case did the employees select the UAW as their exclusive bargaining representative.

The Administrative Law Judge (ALJ) who heard the case dismissed the complaint, first on procedural grounds not at issue on this appeal, and in the alternative on the merits. The ALJ determined that Dana had not granted recognition to a minority union, which would have been an unfair labor practice under the holding of *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731 (1961) ("*Bernhard-Altmann*"). Nor did the LOA violate the corollary principle of *Majestic Weaving Co.*, 147 NLRB 859 (1964), *enf. denied*, 355 F.2d 854 (2d Cir. 1966), that an employer could not negotiate a tentative contract with a union that had not yet achieved majority status, where the contract is conditioned on the union's gaining majority support. The ALJ reasoned that the LOA was "a far cry from a collective-bargaining agreement." *Dana Corp.*, 356 NLRB49, at *3. The ALJ also alternatively relied upon the fact that Dana already had collective-bargaining agreements with the UAW at other plants, and those agreements could have required Dana to recognize the union as the bargaining representative of additional, future facilities, and apply the collective-bargaining agreement to those employees, once the unions achieved majority status, under the Board's precedent in *Houston Division of the Kroger Co.*, 219 NLRB 388 (1975).

According to Article 7.1 of the LOA, the Agreement expired on June 8, 2007. On December 30, 2007, after the ALJ's decision was announced but before the Board's opinion was made public, Dana sold its St. Johns, Michigan facility to MAHLE Engine Components USA, Inc.

After the sale, the Board issued a 2-1 opinion upholding the ALJ's dismissal of the complaint on the merits. The Board began by identifying the primary legislative purpose of the operative statutory language. An employer is prohibited by section 8(a)(2) of the NLRA from "dominat[ing] or interfer[ing] with the formation or administration of any labor organization or contribut[ing] financial or other support to it," and the purpose of this language "was to eradicate company unionism, a practice whereby employers would establish and control in-house labor organizations in order to prevent organization by autonomous unions." *Dana Corp.*, 356 NLRB49, at *5 (quoting 1 Higgins, *Developing Labor Law* 418-419 (5th ed. 2006)).

> Section 8(a)(2) is grounded in the notion that foisting a union on unconsenting employees and thus impeding employees from pursuing representation by outside unions are incompatible with "genuine collective bargaining." It is in this context that the statutory prohibition on "financial or other support" to unions must be understood.

Id. at *6. The amount of employer cooperation that crosses the line and becomes unlawful support, according to the Board, "is not susceptible to precise measurement." *Id.* (citation and quotation marks omitted). The Board then detailed its long recognition of the legality of various types of agreements and understandings between employers and unrecognized unions.

The Board acknowledged that employer recognition of a minority union as the exclusive bargaining representative crosses the line, as the Supreme Court held in *Bernhard-Altmann*, even if the employer in good faith believed that the union had majority support. The Board also acknowledged its extension of this principle in *Majestic Weaving* to bar negotiation of a collective-bargaining agreement conditioned on the later attainment of majority status by a union. The Board did not read its own *Majestic Weaving* precedent, however, to create a rule that any negotiation with a union over substantive terms of employment is per se unlawful.

The Board distinguished *Majestic Weaving* on several grounds. *Majestic Weaving* involved an initial, oral grant of exclusive recognition, followed by the negotiation of a complete collective-bargaining agreement, consummated but for a ministerial act, whereas the LOA in this case "did no more than create a framework for future collective bargaining, if . . . the UAW were first able to provide proof of majority status." *Id.* at *8. Instead of an exclusive-representation provision, which was banned in *Bernhard-Altmann*, the LOA expressly prohibited Dana from recognizing the union without a showing of majority support. The Board reasoned:

> That the LOA set forth certain principles that would inform future bargaining on particular topics—bargaining contingent on a showing of majority support, as verified by a neutral third party—is not enough to constitute exclusive recognition. The UAW did not purport to speak for a majority of Dana's employees, nor was it treated as if it did. On the contrary, the LOA unmistakably disclaimed exclusive recognition by

setting forth the process by which such status could be achieved. Nothing in the LOA affected employees' existing terms and conditions of employment or obligated Dana to alter them. Any potential effect on employees would have required substantial negotiations, following recognition pursuant to the terms of the Agreement. Nothing in the Agreement, its context, or the parties' conduct would reasonably have led employees to believe that recognition of the UAW was a foregone conclusion or, by the same token, that rejection of UAW representation by employees was futile.

*Id.* at *9.

The Board found support for its conclusion in the policy underlying the NLRA. "The ultimate object of the National Labor Relations Act, as the Supreme Court has repeatedly stated, is 'industrial peace.'" *Id.* at *10 (citing *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996)). The Board expressed its reluctance to put "new obstacles" in the way of voluntary recognition of a union (e.g., recognition of a union's majority status by authorization cards rather than by election), and further noted that "[i]n practice, an employer's willingness to voluntarily recognize a union may turn on the employer's ability to predict the consequences of doing so." *Id.* The Board reasoned that, "[c]ategorically prohibiting prerecognition negotiations over substantive issues would needlessly preclude unions and employers from confronting workplace challenges in a strategic manner that serves the employer's needs, creates a more hospitable environment for collective bargaining, and—because no recognition is granted unless and until the union has majority support—still preserves employee free choice." *Id.*

Having rejected a categorical rule, the Board proceeded to determine that the LOA in this case was well within the boundaries of the NLRA:

The LOA was reached at arm's length, in a context free of unfair labor practices. It disclaimed any recognition of the union as exclusive bargaining representative, and it created, on its face, a lawful mechanism for determining if and when the union had achieved majority support. The LOA had no immediate effect on employees' terms and conditions of employment, and even its potential future effect was both limited and contingent on substantial future negotiations. As its statement of purpose makes clear, the LOA was an attempt to directly address certain challenges of the contemporary workplace. Considering the LOA as a

whole, we find nothing that presents UAW representation as a fait accompli or that otherwise constitutes unlawful support of the UAW. Indeed, according to the General Counsel, employees here had no difficulty in rejecting the UAW's representation.

*Id.* at *11.

One member of the Board dissented, arguing that the LOA included "substantive contract provisions" and that there were "no meaningful factual or legal distinctions" between the LOA at issue in this case and *Majestic Weaving Co.*, 147 NLRB 859 (1964). *Dana Corp.*, 356 NLRB49, at *14 (Hayes, dissenting). According to the dissent, the majority "effectively overrule[d] *Majestic Weaving*," because "premature recognition is *not* a prerequisite for finding unlawful support in dealings between an employer and a minority union." *Id.* (emphasis in original).

At the heart of the dissent's argument was the concern that, in the context of the LOA, "employees could reasonably believe they had no choice but to agree to representation by the UAW without even knowing whether they approved or disapproved of the contract terms that union had negotiated for them." *Id.* at *17. The dissent rejected the majority's description of the LOA as merely a "framework" for future bargaining, finding instead that the LOA, specifically Article 4.2.4, included "substantive terms and conditions of employment" that "*had to be included* in any prospective future collective-bargaining agreement[s] covering these employees." *Id.* at *16 (emphasis in original). According to the dissent, the LOA "significantly limited the parameters" for negotiations on a number of other issues as well, including: future contract terms (4-5 years); health care cost initiatives; eight bargaining subjects; interest arbitration after six months of negotiation; and a waiver of strike rights prior to the final contract. *Id.* The dissent also dismissed the policy rationale put forth by the majority, arguing that even if employers and unions benefitted from negotiations, "the legality of negotiating such terms must turn on the statutory rights of employees, not on the commercial interests of unions and employers." *Id.* at *17.

The majority addressed the dissent's concerns in its opinion, noting that the Board's precedent does not "compel the categorical conclusion that an employer violates

Section 8(a)(2) whenever it 'negotiates terms and conditions of employment with a union before a majority of unit employees . . . has designated the union as their bargaining representative.'" *Id.* at \*12. Among other things, the majority countered the dissent's contention that the employees "could reasonably believe they had no choice but to agree to union representation," by pointing out that a majority of the employees *rejected* the UAW, and the UAW was never selected as the employees' exclusive bargaining representative. *Id.* (alterations omitted). In fact, according to the majority, agreements like the LOA "promote an informed choice by employees" because the employees "presumably will reject the union if they conclude or suspect that it has agreed to a bad deal or that it is otherwise compromised by the agreement from representing them effectively." *Id.*

Petitioners filed a timely petition for review of the Board's decision to dismiss the complaint, and Dana Companies, LLC and the UAW intervened. Although Intervenor Dana Companies argues that this case is moot because the St. Johns facility is no longer covered by the agreement or even owned by Dana, both the petitioners and the Board agree that the case is not moot because of the requirement that would be imposed by the Board, should the Board lose this appeal, to post notices recognizing their obligation not to enter into agreements such as the one at issue. We accept the Board's contention that there continues to be an Article III case or controversy on this basis. *See NLRB v. Hiney Printing Co.*, 733 F.2d 1170, 1171 (6th Cir. 1984); *NLRB v. Great Western Coca-Cola Bottling Co.*, 740 F.2d 398, 406 (5th Cir. 1984). Dana also argues that we should deny the petition because the petitioners are not "person[s] aggrieved" such that they may petition for review under Section 10(f) of the NLRA. Because there is an Article III case or controversy, and because we deny the petition for review on the merits as explained below, we need not reach intervenor's alternative statutory argument for denying the petition. *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 97 (1998)) ("Unlike Article III standing, which ordinarily should be determined before reaching the merits, statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action.").

The thoughtful majority and dissenting opinions of the Board members in this case show that reasonable minds could differ as to how the NLRA should be interpreted to further the underlying purposes of the NLRA in the context of employer negotiations with unions that do not have majority status. We must deny the petition for review, not because we find one position more persuasive than the other, but because Congress has given the Board the power to make industrial policy as long as it is doing so within the confines of the statutory language. While "[w]e review the Board's conclusions of law unrelated to the National Labor Relations Act *de novo* . . . otherwise [we] show deference to the Board's reasonable interpretation of the Act." *Lee v. NLRB*, 325 F.3d 749, 754 (6th Cir. 2003). The Board "need not show that its construction is the *best* way to read the statute; rather, courts must respect the Board's judgment so long as its reading is a reasonable one." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996) (emphasis in the original). Indeed, the balancing of "conflicting legitimate interests" in pursuit of "the national policy of promoting labor peace through strengthened collective bargaining" is "precisely the kind of judgment that . . . should be left to the Board." *Charles D. Bonanno Linen Serv. v. NLRB*, 454 U.S. 404, 413 (1982).

The Board reasonably held that the LOA did not include the type of an explicit recognition of a union that the Supreme Court determined to be unlawful in *Bernhard-Altmann*. In that case, the employer and the union signed a "memorandum of understanding" that "recognized the union as exclusive bargaining representative of all production and shipping employees." *Bernhard-Altmann*, 366 U.S. at 734 (quotations omitted). Even though the union in *Bernhard-Altmann* had achieved majority status by the time a formal collective-bargaining agreement was reached, the Supreme Court held that the memorandum of understanding was still an unlawful form of pre-recognition bargaining because it granted the union "a deceptive cloak of authority with which to persuasively elicit additional employee support." *Id.* at 736.

In contrast, the pre-recognition agreement at issue in this case contains an explicit notice that Dana would *not* recognize the Union prior to the union's receiving a majority vote of the employees. Article 3.1 stated:

> The parties understand that the Company may not recognize the Union as the exclusive representative of employees in the absence of showing that a majority of the employees in an appropriate bargaining unit have expressed their desire to be represented by the Union.

In addition, the "Purpose" section of the LOA, Article 2.1.3.5, which both parties agreed to communicate to the employees, emphasized the fact that "[e]mployee's freedom to choose is a paramount concern of Dana as well as the UAW." In light of the differences between the memorandum of understanding in *Bernhard-Altmann* and the LOA at issue in this case, it was reasonable for the Board to hold that this agreement did not unlawfully recognize the union as the exclusive bargaining representative of Dana's employees.

The LOA was also not a form of "oral recognition" that the NLRB determined to be an unlawful form of pre-recognition bargaining in *Majestic Weaving Co.*, 147 NLRB. 859 (1964) *enf. denied*, 355 F.2d 854 (2d Cir. 1966). In that case, the Board held that even though the employer "conditioned the actual signing of a contract with Local 815 on the latter achieving a majority [of employees' support]," the fact that contract negotiations followed "an *oral recognition agreement*" constituted premature recognition of the union as the exclusive bargaining representative. *Majestic Weaving*, 147 NLRB at 860-61 (emphasis in original). Not only did no such oral agreement occur in this case, but both parties explicitly agreed *not* to recognize the union until the union received the requisite show of support from the majority of Dana's employees.

The Board also reasonably found that the LOA was not a full collective-bargaining agreement and required substantial negotiations, post-recognition, before it could become the employees' terms and conditions of employment. In *Bernhard-Altmann*, the Supreme Court held that an agreement that included "certain improved wages and conditions of employment," and that was simply waiting for execution of a "formal agreement *containing these terms*" was unlawful. *Bernhard-Altmann*, 366 U.S. at 734 (emphasis added). While petitioners state that the LOA included "pre-negotiated concessions" and "contractual" obligations, Petitioners' Br. at 8, 17, the Board determined that the LOA "did no more than create a framework for future collective

bargaining," *Dana Corp.*, 356 NLRB49, at *8, and was shy of the full agreements that required little more than formal execution and were held to be unlawful in *Bernhard-Altmann*.   While some of the provisions in the LOA *may* have become binding if arbitration was necessary, the Board's interpretation of the NLRA and how the LOA relates to the statute is nonetheless still "a reasonable one."  *See Holly Farms Corp.*, 517 U.S. at 409.

Petitioners argue that Article 4 contains the bulk of the problematic "contractual" obligations.  Petitioners' Br. at 8, 17.  For instance, petitioners claim that Article 4.2.1 "compel[s] the UAW" because it specifies certain "premium sharing, deductibles, and out of pocket maximums" for health care costs to be maintained.  Petitioners also argue that Article 4.2.4 includes examples of substantive terms that "contractually b[ind]" the employees of Dana.  Petitioners' Br. at 18.  These general terms included:

- Health care costs that reflect the competitive reality of the supplier industry and product(s) involved
- Minimum classifications
- Team-based approaches
- The importance of attendance to productivity and quality
- Dana's idea program (two ideas per person per month and 80% implementation)
- Continuous improvement
- Flexible compensation
- Mandatory overtime when necessary (after qualified volunteers) to support the customer

At the heart of the dispute between the parties is the extent to which the terms in Article 4 are "substantive" because they are "binding."  On their face, the terms in Article 4.2.4 are not specific, and would require further negotiations to reach any level of detail.  However, Article 4.2.5 requires arbitration if both parties do not reach the first formal agreement within six months, and that agreement—according to the LOA—must include the provisions discussed in Article 4.2.4.  In this way, terms regarding "mandatory overtime" or "compensation," for instance, could become binding.  As the entity entrusted with maintaining "industrial peace," however, the Board was within its discretion to allow some substantive terms to be determined between the employer and

union prior to recognition, as long as that agreement did not ultimately impact employees' choice regarding union representation. With the LOA in this case, employees may decide if they agree with the general principles that the agreement sets forth as well as if they are willing to risk being bound to any concessions that the union may make during negotiations of the first formal contract. If the employees are not willing to take that risk, then they do not have to select the union as their exclusive bargaining representative. In this instance, the employees at Dana did not select the UAW.

Petitioners also point to other LOA provisions as evidence of the substantive and binding nature of the LOA. These provisions fit even more comfortably within the Board's reasoning that some agreements short of a complete collective-bargaining agreement are acceptable. For instance, Article 4.2.2 states that any future agreements between the union and the company will be of a "minimum duration of . . . four years." While contract duration is obviously important, the Board could conclude that it is part of the framework for negotiation that may be appropriately agreed upon before the employees choose whether to accept the union. Again, if employees felt hindered by this provision, they could reject any union that would make this concession on their behalf—and they ultimately did by not selecting UAW as their exclusive bargaining representative.

Petitioners also cite Article 6, the no-strike/no-lockout provision, as an infringement upon the rights of employees to select their own exclusive bargaining representative. Petitioners' Br. at 18. However, as the Board and Dana point out, this provision is only applicable until "the resolution of the first contract at each facility." Thus, this is an agreed-upon mechanism—one the employees can reject by not choosing the UAW—to ensure that bargaining moves forward in an attempt to achieve "industrial peace." *See Auciello Iron Works,* 517 U.S. at 785. It is not a permanent forfeiture of the employees' rights.

Finally, petitioners point to provisions in the LOA that they argue "contractually b[ind]" Dana's employees, Petitioners' Br. at 18, such as Article 5's dispute resolution

mechanism.    While petitioners argue that Article 5 makes the LOA binding or enforceable, the dispute resolution mechanism is specifically intended to address any "violation(s) of this Agreement," and is limited to the process the parties will undergo *prior to reaching a full collective-bargaining agreement*.    Thus, like the no-strike/no-lockout provision, this is a limited concession that employees were free to reject.

Though the petitioners rely heavily on the dissent's interpretation of Supreme Court and Board precedent, the Board majority's response to these concerns was reasonable.    Again, our task is not to determine which NLRB members were more persuasive, but whether the majority's interpretation of the NLRA was reasonable.

Petitioner attempts to limit the degree of our deference to the Board by characterizing the issue before us as one of interpretation of the LOA.    But there is no real issue presented to us as to the meaning of the LOA.    The question is whether the LOA, which pretty much says what it says, violates the NLRA.    It is the scope of the prohibitions of the NLRA—what constitutes unlawful interference—that is at issue, and this is clear from the arguments of both the majority and dissenting Board members.    We are required to defer to the Board's reasonable interpretation of the statute.

For the foregoing reasons, we deny the petition to review.