RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0263p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KELLOGG COMPANY,

                          *Petitioner/Cross-Respondent,*

    *v.*

NATIONAL LABOR RELATIONS BOARD.

                          *Respondent/Cross-Petitioner,*

BAKERY, CONFECTIONERY, TOBACCO WORKERS
AND GRAIN MILLERS INTERNATIONAL UNION, AFL-
CIO; BAKERY, CONFECTIONERY, TOBACCO
WORKERS AND GRAIN MILLERS LOCAL UNION 252-
G,

                          *Intervenors.*

                                     Nos. 15-2031/2183

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations Board.
No. 15-CA-115259.

Argued: June 16, 2016

Decided and Filed: October 26, 2016

Before: SILER, BATCHELDER, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David M. Buday, MILLER JOHNSON, Grand Rapids, Michigan, for
Petitioner/Cross-Respondent. Joel A. Heller, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for Respondent/Cross-Petitioner. **ON BRIEF:** David M. Buday, Keith E.
Eastland, MILLER JOHNSON, Grand Rapids, Michigan, for Petitioner/Cross-Respondent. Joel
A. Heller, Kira Dellinger Vol, NATIONAL LABOR RELATIONS BOARD, Washington, D.C.,
for Respondent/Cross-Petitioner. Jeffrey R. Freund, Devki K. Virk, BREDHOFF & KAISER,
P.L.L.C., Washington, D.C., for Intervenors.

1

———————————————

**AMENDED OPINION**

———————————————

JULIA SMITH GIBBONS, Circuit Judge.   The Kellogg Company (Kellogg) and the Bakery, Confectionery, Tobacco Workers and Grain Millers Local Union 252-G (the Union) began negotiations for a successor to their Memphis Agreement, a local collective bargaining agreement (CBA) that was to expire soon.   Negotiations failed when the Union refused to negotiate with respect to any of Kellogg's proposed revisions.   Kellogg responded by locking out approximately 200 bargaining-unit employees.   The National Labor Relations Board (the Board) found that Kellogg's proposal effectively modified the terms of the unexpired Master Agreement, and therefore constituted an unlawful mid-term modification in violation of the National Labor Relations Act (NLRA).   Because we conclude that the proposal did not modify the express terms of the Master Agreement and because *Milwaukee Spring*, 268 N.L.R.B. 601 (1984), disclaims the "effective modification" theory imposed by the Board in this case, we grant the petition for review, grant enforcement and affirm the Board's decision with respect to the information-request finding, and vacate the rest of the Board's decision.

**I.**

The relationship between Kellogg and the Union is governed by two separate agreements: the Master Agreement and the supplemental Memphis Agreement.   The Master Agreement was effective from September 30, 2012 through October 3, 2015 while the Memphis Agreement was in effect from October 22, 2010 until October 20, 2013.   Prior to entering into the Master Agreement, Kellogg entered into "supplemental agreements" with the local union at each plant. The Master Agreement applies to four of Kellogg's plants, including the Memphis, Tennessee plant while the Memphis Agreement is specific to the Memphis location.   The Master Agreement explicitly covers "only those matters specifically included [t]herein."   Master Agreement 1, CA6 R. 23.   It further provides that unless the parties agree, issues covered in the Master Agreement will not be subject to negotiation "in an effort to secure changes in or to secure a new Supplemental Agreement" and issues covered in the supplemental agreements will not be subject

to negotiation "in an effort to secure changes in or a new version of [the Master] Agreement." *Id.* at 2.

The Master Agreement grants regular employees various benefits such as severance pay, paid holidays, insurance benefits, and participation in a stock purchase and dividend reinvestment plan. The Master Agreement does not distinguish between regular and non-regular employees except for one reference in the Wage Appendix, which governs "[a]ll matters pertaining to hourly wages," *id.* at 33, and establishes a rate of $6.00 per hour less than "job rate . . . for all work performed by *non-regular employees*, such as temporary and *casual employees*." *Id.* at 66–67 (emphasis added). This is the only reference to non-regular employees or casual employees in the Master Agreement.

The Memphis Agreement, however, distinguishes between regular and casual employees. Section 107 of the Memphis Agreement defines the purpose of the "casual program" as "provid[ing] regular employees with relief from extended work schedules through the use of Casual employees." Memphis Agreement 8, CA6 R. 23. Except in limited circumstances, casual employees under the Memphis Agreement would only be "used after overtime has been offered to regular employees" and generally could not be used when regular employees were on layoff. *Id.* at 8–9. The number of casual employees was also capped at 30% of the total number of regular employees. And though casual employees were offered some "fringe benefits" such as lunch, breaks, and other benefits provided in the Master Agreement's Wage Appendix, they were otherwise not subject to the terms and conditions of the Master Agreement or Memphis Agreement.

On September 17, 2013, Kellogg and the Union began negotiations for a successor to the Memphis Agreement. The negotiations came to a standstill over Kellogg's proposed modifications to the casual program. Under Kellogg's proposal, the casual program would no longer serve simply to provide scheduling relief to regular employees, but would "include any employees hired by Kellogg to perform production or any other bargaining unit work covered by" the Memphis Agreement. Kellogg's Last/Best Offer 4, CA6 R. 23. Moreover, casual employees would no longer "be limited in the scope of their work, duties, tasks, hours, or in any other terms or conditions of employment" and could "be employed on an indefinite basis,"

giving Kellogg unrestricted "rights to hire, use, manage, or direct Casual employees." *Id.* Casual employees would also be granted new rights, such as seniority rights, access to a grievance procedure, participation in the job bidding process, and priority in the event that Kellogg established an alternative crewing schedule. The Union steadfastly refused to negotiate with Kellogg concerning these proposals. For instance, when Kellogg's representative pressed the Union for alternative solutions to its proposals, the Union representative replied, "No—I don't have to do that. I know you are really nice but I don't mind telling you no every time." 2013 Memphis Suppl. Negotiations 23, Sept. 17, 2013, CA6 R. 23. Insisting that Kellogg was attempting to bargain for amendments to the Master Agreement, rather than the Memphis Agreement, the Union representative finally concluded negotiations stating, "we are done negotiating, we are done . . . done forever." 2013 Memphis Suppl. Negotiations 1, Oct. 15, 2013, CA6 R. 23.

After the parties reached impasse,[1] Kellogg sent the Union its "Last/Best Offer" dated October 16, 2013, threatening to lock out all Memphis bargaining unit employees effective October 22, 2013, if the Union declined to accept its offer by 7:00 a.m. on that date. When the Union did not respond, Kellogg locked out approximately 200 of its bargaining-unit employees.

The Union filed a complaint on March 27, 2014, and the ALJ held a trial on the alleged unfair labor practice charges. The ALJ noted that the Master Agreement covers little about casual employees, but that supplemental agreements "have determined the scope and operation of the casual employee program at the[] respective plants." Decision 23, CA6 R. 23. Therefore, the ALJ concluded that Kellogg's proposals did not contravene the terms of the Master Agreement, but rather spoke to the provisions of the Memphis Agreement, so the proposals were not mid-term modifications of the Master Agreement, but rather mandatory subjects of bargaining. He further determined that a bona fide impasse was reached between the parties due to the Union's failure to negotiate the proposals, so Kellogg was entitled to impose a lockout.

The Board reversed the ALJ's decision. It concluded that the ALJ "misperceived the *impact*" of Kellogg's proposals, which was to permit Kellogg "to cease hiring all regular

---

[1]Neither party disputes that impasse was reached.

employees in the future and replace them with lower paid 'casual' employees." Decision and Order 5, CA6 R. 23 (emphasis added). Kellogg repeatedly sought analogous modifications to regular employees' wages and benefits during the 2005, 2009, and 2012 negotiations of the Master Agreement, but the parties never accepted these changes. In essence, the Board determined, Kellogg "sought to retain all of the traditional attributes of regular employees that benefit it the most . . . while instituting across-the-board cuts to the wages and benefits that were bargained for newly hired regular employees in the Master Agreement." *Id.* The proposal would modify the definition of casuals to encompass basically any new hire. Thus, the Board opined, while the Master Agreement made clear that the parties intended that the "core work force of permanent full-time employees" receive the benefits negotiated for regular employees, Kellogg's proposals "*effectively alter* the Master Agreement's wage rates and benefits for newly hired regular employees." *Id.* at 5–6 (emphasis added). The Board noted that a proposal to modify the Master Agreement mid-term is non-mandatory, and thus cannot be insisted upon as a condition for reaching an agreement for mandatory subjects. It further observed that a lockout is permissible only if undertaken in support of a legitimate bargaining position. As a result, the Board concluded, Kellogg's attempt to compel acceptance of a mid-term modification of the Master Agreement by threatening to lockout, then locking out its employees violated Sections 8(a)(1), (3), and (5) of the NLRA.

Kellogg petitioned this court for review and the Board filed a cross-application for enforcement of its order.

**II.**

We review for substantial evidence the Board's factual determinations and its application of law to facts. *NLRB v. Galicks, Inc.*, 671 F.3d 602, 607 (6th Cir. 2012). This standard will be met "if a reasonable mind might accept the evidence as 'adequate to support a conclusion.'" *NLRB v. Int'l Bhd. of Elec. Workers*, 514 F.3d 646, 649 (6th Cir. 2008) (quoting *Vanguard Fire & Supply Co. v. NLRB*, 468 F.3d 952, 957 (6th Cir. 2006)). We review the Board's interpretation of contract terms *de novo*. *NLRB v. Local 334, Laborers Int'l Union of N.A.*, 481 F.3d 875, 879 (6th Cir. 2007). Though we also review *de novo* the Board's legal conclusions that are unrelated to the NLRA, *Montague v. NLRB*, 698 F.3d 307, 314 (6th Cir.

2012), we must defer to the Board's reasonable interpretations of the NLRA, giving respect to the Board's judgment as long as it is "reasonably defensible," *Int'l Bhd. of Elec. Workers*, 514 F.3d at 650 (quoting *Vanguard*, 468 F.3d at 957). We need not agree that the Board's construction is the "*best* way" to read the NLRA, but rather leave it to the Board to balance "conflicting legitimate interests in pursuit of the national policy of promoting labor peace through strengthened collective bargaining." *Montague*, 698 F.3d at 314 (citation omitted) (internal quotation marks omitted); *accord Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 201–02 (1991). However, this court must not stand back and "rubber-stamp" Board decisions that controvert the NLRA; instead it must carefully scrutinize accusations that the Board failed to abide by precedent. *Vokas Provision Co. v. NLRB*, 796 F.2d 864, 869 (6th Cir. 1986) (citation omitted). This principle notwithstanding, the Board may depart from its precedent if its departure is explained and "explicitly and rationally justified." *Kindred Nursing Ctrs. v. NLRB*, 727 F.3d 552, 560 (6th Cir. 2013) (citation omitted); *accord Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) ("Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.") If the basis for the departure is adequately explained, the standard of review is whether the Board decision was "arbitrary and capricious." *Kindred Nursing*, 727 F.3d at 560.

**III.**

Section 8(d) of the NLRA imposes a mutual obligation on both employers and unions to "confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). However, no such duty exists if "any modification of the terms and conditions contained in a contract for a fixed period . . . is to become effective before such terms and conditions can be reopened under the provisions of the contract." *Id.* Thus, a modification pertaining to a provision in a contract that has yet to expire, a mid-term modification, is not one about which the parties have a duty to bargain. *See id.*; *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958); *Smurfit-Stone Container Enters.*, 357 N.L.R.B. 1732, 1733 (2011) ("But absent a reopener provision covering the proposal, under

Section 8(d) of the Act the other party is under no obligation to consent to the [mid-term] modification or even to discuss it."). Insistence on such a subject of bargaining violates the NLRA. *Smurfit-Stone Container Enters.*, 357 N.L.R.B at 1733. Prohibiting forced bargaining on mid-term modifications furthers the NLRA's policy of reducing "industrial strife" and helps maintain stability in the terms and conditions of employment agreed upon by the parties. *Chesapeake Plywood, Inc.*, 294 N.L.R.B 201, 201 (1989). A party's insistence on a mid-term modification to the point of impasse—the "point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless," *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 761–62 (6th Cir. 2003) (citation omitted)—violates the NLRA. *Smurfit-Stone Container Enters.*, 357 N.L.R.B at 1733. So does locking out employees for refusing to negotiate a mid-term modification. *See Horsehead Res. Dev. Co. v. NLRB*, 154 F.3d 328, 344 (6th Cir. 1998) ("A lockout can . . . be unlawful if it is implemented out of hostility to the process of collective bargaining." (citing *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 309 (1965))); *Rangaire Acquisition Corp.*, 309 N.L.R.B 1043, 1050 (1992) (concluding that the NLRA prohibits a lockout to "coerce [employees] into consenting to reopening and agreeing to modify the terms and conditions of the existing collective-bargaining contract").

## A.

Kellogg contends that the Board reached its conclusion by "inferring a contractual work guarantee for regular employees that simply does not exist." Pet'r Br. 3, CA6 R. 22. This, it argues, is contrary to the language of the Master Agreement, which expressly prohibits the use of implied terms, and further "includes no express guarantees or 'core work force' terms governing the allocation of work between casual and regular employees." *Id.* at 3–4, 18–21. The only provision in the Master Agreement pertaining to casual employees, Kellogg asserts, is unaffected by its proposal.

The Board responds that Kellogg's proposal "would modify the unexpired Master Agreement's [express] provisions regarding wages, benefits, overtime, and premium pay" and would further "erase the Master Agreement's distinction between 'regular' and 'non-regular'/'casual' employees." Resp't Br. 16, 27, CA6 R. 27. It asserts that because the Master

Agreement did not define "casual employees," the definition carries its ordinary meaning, which is "short term, temporary, sporadic employees." *Id.* at 25 & n.7.

We interpret a CBA as a contract, looking first to its plain language "for clear manifestations of the parties' intent." *Moore v. Menasha Corp.*, 690 F.3d 444, 451 (6th Cir. 2012). To the extent we find the plain language ambiguous, we may look outside of the document to determine the parties' intent by examining "relevant extrinsic evidence, such as a past practice of the parties in regard to the effectuation or implementation of the contract provision in question, or the bargaining history of the provision itself." *Mining Specialists, Inc.*, 314 N.L.R.B. 268, 268–69 (1994); *accord Moore*, 690 F.3d at 451.

The Master Agreement covers "only those matters specifically included [t]herein." Master Agreement 1, CA6 R. 23. The only reference to casual employees specifically included therein pertains to the wage rate for casual employees and the Board does not contest that Kellogg's proposal does not affect this provision. The Master Agreement has no "system" of regular and casual employees. *See* Resp't Br. 21, CA6 R. 27. It is the Memphis Agreement, regarding which both parties were required to negotiate, that defines casual employees and sets forth the terms of the casual program. As the Master Agreement does not distinguish between regular and casual employees aside from the limited purpose of wages, the Board is incorrect that the proposal erases the Master Agreement's distinction between the two, as there is no such distinction to erase. The provisions pertaining to regular employees in the Master Agreement are untouched by the proposal.

The Board also makes much of the definition of casual employees, but casual employees were never defined in the Master Agreement. The definition was included in the Memphis Agreement's description of the casual program. Likewise, though the Board complains that under the proposal, Kellogg could hire new casual employees while regular employees were in layoff, the obligation imposed on Kellogg not to do so is one placed on it by the Memphis Agreement, not the Master Agreement.

In looking to the plain, unambiguous language of the Master Agreement and the proposal, the latter simply does not modify the former so we need not look outside of the text of

either writing.  Thus, the success of the Board's argument turns on the viability of its effective modification theory.

**B.**

Kellogg next argues that the Board's decision conflicts with its precedent in *Milwaukee Spring*.  According to Kellogg, *Milwaukee Spring* stands for the proposition that, in determining whether there has been a modification, the Board must identify a specific term contained in the contract and is not permitted to find "an implied work preservation term 'based on wage and benefits or recognition provisions' in an unexpired contract."  Pet'r Br. 4, 31–32, CA6 R. 22.  Thus, it concludes, there can be no effective modification under Section 8(d).

While the Board concedes that the Master Agreement does not guarantee regular employees any "minimum hours of work, overtime, or particular schedules," it contends that the proposal not to hire any regular employees would effectively terminate any provisions for newly hired regular employees.  Resp't Br. 26–27, CA6 R. 27.  The Board also insists that *Milwaukee Spring* "simply held that no term in the parties' single contract had been modified, effectively or otherwise," but that subsequent cases approved of an effective modification theory.  *Id.* at 30.

To resolve this issue, we first turn to *Milwaukee Spring*.  We note, though, that the Board did not mention or discuss *Milwaukee Spring* in its decision.

The employer in *Milwaukee Spring* asked the union to forgo a scheduled wage increase or, alternatively, to relocate the union's operations to a nonunionized facility so that the employer could obtain relief from the comparatively higher labor costs at the unionized Milwaukee Spring facility.  268 N.L.R.B. at 601.  Though the union rejected these proposals, the employer nevertheless relocated work to the nonunionized facility.  *Id.*  Applying the principles underlying Section 8, the Board concluded that "before the Board may hold that Respondent violated Section 8(d), the Board first must identify a specific term 'contained in' the contract that the Company's decision to relocate modified."  *Id.* at 602.  No such provision was contained in the contract.  *Id.*  Though the union argued that because the relocation decision was motivated by a desire for lower labor costs, it modified the contract's "wage and benefits provisions," the Board rejected this argument.  *Id.*  It concluded that if the parties had wanted to draft a provision

requiring that work remain at the Milwaukee Spring facility, they could have, but did not. *Id.* The Board concluded that it was not its role "to create an implied work-preservation clause in every American labor agreement based on wage and benefits or recognition provisions," and "expressly decline[d] to do so." *Id.* To hold otherwise, the Board observed, would "add[] to the collective-bargaining agreement terms not agreed to by the parties and foreclose[] the exercise of rational economic discussion and decision-making which ultimately accrue to the benefit of all parties." *Id.* at 603.

Subsequent decisions likewise require that the Board find a specific term in the contract that is modified by the proposal and prohibit the Board from implying a work preservation term based on "wage and benefits provisions" in an agreement. *See, e.g., FMC Corp*, 290 N.L.R.B. 483, 484–85 (1988) (relying on *Milwaukee Spring* in concluding that "there [was] no evidence that the parties' contract contained a provision which restricted or otherwise preserved the performance of the [bargaining-unit] work to the [unionized] facility," so the employer did not engage in an unlawful mid-term modification); *Ad-Art, Inc.*, 290 N.L.R.B. 590, 607–08 (1988) (concluding that *Milwaukee Spring* was inapplicable because the contract at issue "contained express provisions prohibiting the reassignment or transfer of work without the Unions' consent"). For instance, in *Suburban Transit Corp.*, the employer transferred work from one set of employees, employed by Transit, to another, employed by Trails, despite the union's rejection of the proposal. 276 N.L.R.B. 15, 18 (1985). Prior to the Board's decision in *Milwaukee Spring*, the ALJ concluded that the employer violated the NLRA because it "attempted to accomplish indirectly what it could not legally do directly—the modification of the terms of the Transit employees' existing contract." *Id.* However, on remand for reconsideration in light of *Milwaukee Spring*, the ALJ issued a supplemental decision, which the Board adopted. *Id.* at 15. On remand, the union argued that its case was distinguishable from *Milwaukee Spring* because the contract contained a "work-preservation clause," which purportedly preserved the work they had historically done and guaranteed 90 full-time Transit employees would be maintained. *Id.* at 24.[2] Yet, the ALJ concluded that this provision was "nothing more than [the employer's]

---

[2]The provision stated:

Suburban shall have the right to hire part time drivers.

'intention' to maintain a minimum of 90 drivers," which did not guarantee Transit drivers "the right to perform any specific type of work." *Id.* The ALJ also rejected the union's argument that the provision that "[p]art time drivers will be used only when there is an insufficient number of full time drivers to cover all of the available work," constituted an "'express guarantee' . . . that the full-time Transit employees would be ensured of work prior to the employment of part-time (Trails) drivers." *Id.* at 25.

Many of the cases relied on by the Board on appeal include an express term that was directly, not effectively, modified by the employer's proposal, and thus are inapplicable to the Board's effective modification theory. *E.g., St. Vincent Hosp.*, 320 N.L.R.B. 42, 42–45 (1995) (concluding that the employer violated the NLRA by making a mid-term modification concerning a healthcare plan that was "contained in" the CBA after the parties, by "mutual consent" orally added the healthcare plan to the CBA); *E.G. & G. Rocky Flats, Inc.*, 314 N.L.R.B. 489, 493, 497 (1994) (concluding that the employer violated the NLRA by temporarily suspending a training program that was added by agreement of the parties to the CBA); *Link Corp.*, 288 N.L.R.B. No. 132, 1988 WL 213934, at *2 (1988) ("[T]he Respondent unilaterally *modified the terms of article XXXIII of the agreement* by ceasing to make required premium payments and thereby effectively terminating all employee group insurance benefits set forth in that article." (emphasis added)); *Martin Marietta Energy Sys.*, 283 NLRB 173, 174–75 (1987) (concluding that the employer unlawfully modified the CBA mid-term by adding a new health insurance plan because, although the employees were free to continue in "the negotiated medical insurance plan," the CBA provided that there could be "no 'additions, waivers, deletions,

---

It is the Company's intention to *maintain at least the current level of 90 full time drivers*, provided that the current level of business continues. The Company further intends to enlarge the full time work force.

*Part time drivers will be used only when there is an insufficient number of full time drivers to cover all of the available work.* In all cases the full time drivers shall have their choice between line and charter work provided that there are part time drivers available to cover all open line work. In all cases full time drivers shall have their choice of the biggest paying pieces of work. The Company will also attempt to satisfy full time regular run operators in the assignment of extra work, providing sufficient operators are available to cover all open work.

The limit of work available to full time drivers will be governed only by the "hours of service" regulations of the Department of Transportation, and not by the availability of part time drivers.

*Id.* (emphasis added).

changes or amendments (to the contract) . . . except by mutual consent in writing" (alteration in original)); *C & S Indus., Inc.*, 158 N.L.R.B. 454, 458–59 (1966) (concluding that the employer committed an unlawful mid-term modification in initiating a wage incentive system where there was a term in the contract prohibiting any change in the method of payment).

The remaining cases cited by the Board are likewise inapposite. The Union, in its intervenor's brief, points to *Don Lee Distributor, Inc. v. NLRB*, 145 F.3d 834, 843–44 (6th Cir. 1998), where this court held that there were no "magic words" distinguishing between an unlawful bargaining pact or innocent coordination, but looked to the "totality of the circumstances" to "determine whether the signatories truly" were independent, or whether they "effective[ly]" had veto power. Intervenor Br. 38–39, CA6 R. 29. But *Don Lee* did not deal with the issue presented here of whether the terms of a party's proposal modified the terms of an unexpired CBA. Rather, the inquiry in *Don Lee* was whether the employers *refused to bargain separately* by creating an unlawful multiemployer bargaining relationship, which necessarily required an inquiry into the employers' conduct. 145 F.3d at 842–43. Likewise, in *Stroehmann Bakeries, Inc.*, the Board held that when the employer prohibited regular drivers from selling certain products, it acted contrary to the CBA, which guaranteed all regular drivers a set commission for deliveries of all bakery products. 287 N.L.R.B. 17, 19 (1987). In that case, the employer established a new route, at a lower pay than under the CBA, for deliveries only of cakes. *Id.* However, the CBA established a base pay rate for "all" drivers and a rate for "[c]ommission on *all* sales." *Id.* It also required "drivers to receive full pay and commission on *all* bakery products delivered in his territory" and required "[a]ll bakery products sold . . . [to] be delivered by a regular wholesale sales driver and paid for in accordance with the [aforementioned] wage scale." *Id.* "A more thorough and conscientious effort to set the compensation," the Board concluded "can hardly be imagined by the mind of man." *Id.* Such a conscientious effort was lacking in the Master Agreement.

In sum, the cases relied upon by the Board on appeal do nothing to rebut the principles articulated in *Milwaukee Spring*. Turning to the facts of this case, the Board's position is inconsistent with these principles for several reasons. For one, as discussed above, there is no specific term in the Master Agreement modified by Kellogg's proposal. Moreover, *Milwaukee*

*Spring* and the cases interpreting it disclaim any effective modification theory. A comparison of the facts of this case to *Suburban Transit* illustrates the inapplicability of the Board's theory. As the ALJ found to be the case in *Suburban Transit*, the Union argued Kellogg "attempted to accomplish indirectly what it could not legally do directly—the modification of the terms of the" unexpired Master Agreement. *See* 276 N.L.R.B. at 18. But in *Suburban Transit*, the employer's actions were not in violation of the NLRA. This was true even though that CBA had a term requiring part-time drivers to be used only when there was an insufficient number of full-time drivers—a term like that contained in the expired Memphis Agreement, but not in the unexpired Master Agreement—and a term stating the employer's intention to maintain a set number of full-time drivers—a term neither contained in the Memphis Agreement nor in the Master Agreement. *See id.* at 24. Surely, if, as in *Suburban Transit* and *Milwaukee Spring*, an employer can reassign work away from a class of employees, it can decline to hire a class of employees in the future while maintaining the benefits available to those presently employed.

It may be true, as the Board contends, that these principles allow Kellogg to use "creative semantics" to negotiate for terms in the Memphis Agreement that the Union declined to accept in the negotiations for the Master Agreement. Yet, as illustrated by Board precedent, this is acceptable. It is for the Board, not this court, to balance "conflicting legitimate interests in pursuit of the national policy of promoting labor peace through strengthened collective bargaining." *Montague*, 698 F.3d at 314 (citation omitted) (internal quotation marks omitted). If the Union wanted to provide for a "core work force of permanent full-time employees," *see* Decision and Order 5, CA 6 R. 23, to work at Kellogg and provide them with a set amount of work, the Union could have bargained for terms to that effect in the Master Agreement, but it did not. To the contrary, it *refused* to bargain. Because Kellogg's proposal is not a mid-term modification of the Master Agreement, Kellogg's insistence upon its terms to the point of impasse, and subsequent lockout, did not violate the NLRA. Though the Board in this case concluded to the contrary, it did so without citation to any of its prior precedents, let alone *Milwaukee Spring*. Thus, although the Board argues here that *Milwaukee Spring* was distinguishable and gave no explanation of why *Milwaukee Spring* did not apply, *Milwaukee Spring* obviously *did* apply, and the Board was required to consider and explain its departure from that precedent.

Although we defer to the Board's interpretations of the NLRA if "reasonably defensible," *Int'l Bhd. of Elec. Workers*, 514 F.3d at 650, it is this court's duty not to merely "rubber-stamp" the Board's conclusion, but to carefully scrutinize whether it abided by its own precedent, *Vokas*, 796 F.2d at 869. Here, the Board did not abide by its precedent or explain its failure to do so.

## C.

As to the Board's finding that Kellogg violated Section 8(a)(5) and (1) of the NLRA by refusing to provide its employees' union with specific information requests, Kellogg has not briefed or argued in opposition to enforcement. When a party "fails to challenge a portion of the Board's findings on appeal," the Board "is entitled to summary enforcement as to the uncontested portions of its Decision and Order." *Vanguard Fire & Supply Co. v. NLRB*, 468 F.3d 952, 956 (6th Cir. 2006). Kellogg's actions on appeal have left the finding of a Section 8(a) violation uncontested. We therefore grant enforcement of the Board's petition and affirm its decision as to the information-request violations.

## IV.

For the aforementioned reasons, we grant the petition for review, grant enforcement and affirm the Board's decision with respect to the information-request finding, and vacate the remainder of the Board's decision.